936 So.2d 108 (2006)
STATE of Louisiana
v.
Donald Lee LEGER, Jr.
No. 2005-KA-0011.
Supreme Court of Louisiana.
July 10, 2006.
Rehearing Denied September 1, 2006.
*117 Capital Appeals Project, Jelpi P. Picou, Jr., Marcia A. Widder, Letty S. Digiulio, for appellant.
Charles C. Foti, Jr., Attorney General, J. Phil Haney, District Attorney, Walter J. Senette, Jr., James R. McClelland, Assistant District Attorneys, for appellee.
TRAYLOR, Justice.
On February 5, 2002, a St. Mary Parish grand jury indicted the defendant, Donald Lee Leger, Jr., for the December 11, 2001 first degree murder of Troy Salone, in violation of La. R.S. 14:30. Other, non-capital charges, were included as separate counts in the indictment.[1] On January 6, 2004, the state moved to sever the non-capital offenses charged in the indictment and proceeded to trial only on the one count of first degree murder. Trial commenced with jury selection beginning on January 12, 2004. On January 20, 2004, the jury returned a unanimous verdict of guilty as charged.
After a penalty phase hearing, the same jury unanimously recommended a sentence of death after finding the following aggravating *118 circumstances: (1) that the defendant was engaged in the perpetration or attempted perpetration of an aggravated kidnapping or second degree kidnapping; (2) that the defendant was engaged in the perpetration or attempted perpetration of an aggravated burglary; and (3) that the defendant created a risk of death or great bodily harm to more than one person. La.C.Cr.P. art. 905.4(A)(1) and (4). On February 6, 2004, the trial court imposed the sentence of death in accordance with the jury's verdict.
The defendant now brings the direct appeal of his conviction and sentence to this court pursuant to La. Const. art. 5, § 5(D)[2] raising 32 assignments of error. For the reasons that follow, we find that none of the arguments put forth constitute reversible error, and affirm the defendant's conviction and sentence.

FACTS
Defendant, Donald Lee Leger, Jr., had an affair with Kimberly Zimmerman during a three or four-month period in which she was separated from her husband. The affair ended in late November, 2001, after defendant became jealous and possessive. Thereafter, defendant began threatening and harassing Zimmerman, and twice the police were summoned.
On the morning of December 10, 2001, defendant approached Zimmerman at the Wal-Mart store, where she was shopping with her infant daughter. There, Zimmerman confided to defendant that she thought she might be pregnant with his child. The two made plans to meet back at Wal-Mart later that evening to purchase a home pregnancy test.
After buying the pregnancy test, Zimmerman accompanied defendant back to his residence, where she took the test. While waiting on the results, defendant tried to persuade Zimmerman to reconcile with him and raise their baby together. However, Zimmerman insisted that she was going back to her husband and that she could not have another baby, as she already had four young children. The defendant retrieved the test result from the bathroom and brought it to Zimmerman. The test indicated that Zimmerman was not pregnant, causing the disappointed defendant to comment "I hope you're happy now."[3]
The defendant tried to persuade Zimmerman to have sex with him. When she refused, stating that she planned to reconcile with her husband, the defendant repeatedly asked her "is that your final answer?"[4] When Zimmerman affirmed that her refusal of his advances was her final answer, the defendant reached in the top drawer of his dresser for a 9 mm handgun, which he had recently purchased from a co-worker, stating "I didn't want it to come to this." The defendant pointed the gun at Zimmerman and taunted "I bet you'll make love to me now, won't you?"[5]
The defendant told Zimmerman "I know exactly where I'm going to take you. I'm going to kill you. I'm going to put you and your van in the water and nobody's ever going to find you."[6] The defendant then bound one of Zimmerman's hands with a tie wrap. When Zimmerman started to struggle, he threw her on the bed and put *119 a knee on her back in order to bind her wrists together with the tie wrap. When he was finished binding her, the defendant sat Zimmerman up on the bed, grabbed a bag of bullets in a Crown Royal bag and told her, "I can't go back to prison."[7] He then grabbed a pair of gloves.
The defendant dragged Zimmerman through the house, pausing in the kitchen to grab a knife to cut off a piece of duct tape to place over Zimmerman's mouth because she was screaming and crying. With the knife and gun in hand, the defendant brought Zimmerman outside and placed her in the passenger seat of her vehicle, a blue Ford mini-van. The defendant secured the seat belt across Zimmerman.
After driving a short distance, the defendant removed the duct tape which he had just placed over Zimmerman's mouth, telling her she had "20 minutes to talk to me."[8] The defendant told Zimmerman that he was going to kill her, or maybe he would just kill himself. He reiterated he would not go back to prison. Zimmerman pled for her life, and told defendant things she thought he wanted to hear, namely that she would stay with him and that she would not talk to police.
As Zimmerman noticed they were approaching water, she feared that her death was imminent. She managed to free her hands and jumped out of the moving van near a neighborhood where she saw a handful of homes with lights on. The defendant snatched at Zimmerman to prevent her escape but only succeeded in pulling off her sweater. The defendant followed Zimmerman out of the passenger side of the van until he realized the van was continuing to roll forward. He then re-entered the van to stop it.
Zimmermane ran from the van screaming, "God, somebody please help me"[9] and "Help, he's going to kill me."[10] Zimmerman found refuge in the home of Steven Andrade, roughly the third home down from where she jumped out of the van. After the defendant stopped the van, he jumped out chasing after Zimmerman. But he looked for her at the first residence they had stopped in front of, the trailer home of victims Evelyn and Troy Salone at 896 Verdunville Road in Franklin, Louisiana.
Just before midnight, Evelyn Salone was about to fall asleep when she heard a female screaming. Since she believed Troy was already asleep, Evelyn went to see what all the commotion was about. Outside of her home, she encountered defendant in her yard and saw the van still rolling in the road in front of her trailer. Defendant kept hollering "where is she, where is she?"[11] Not knowing who the strange man was looking for, Evelyn asked him, "Who are you looking for? ... I don't know who you're talking about."[12]
Troy Salone appeared at the door of the trailer, and asked what was going on. Defendant asked Troy "where is she?" Troy told him, "put the gun away, there's no need for a gun, put the gun away."[13] At that point, defendant pulled a gun from his waistband and pointed it at Evelyn. Evelyn assured Troy "he's not going to shoot *120 ... it'll be okay,"[14] at which point, the defendant fired the gun into Evelyn's abdomen at point blank range, and she fell to the ground. Troy turned inside the trailer to call for help. Defendant followed Troy inside the trailer, and as Troy reached for the telephone, defendant shot him one time in the head, fatally wounding him.
Evelyn's 15-year-old son, Zeb LeBlanc,[15] woke up when he heard his stepfather, Troy, scream something that sounded like "Man, move that gun."[16] Zeb then heard a gunshot abut four or five seconds later. Zeb jumped out of bed and tried to load a nearby shotgun but was not able to do so because he hands were shaking. When Zeb no longer heard footsteps in the trailer, he peeked out his bedroom window. Zeb then saw Troy lying lifelessly next to the sofa, with blood coming from his head.
Zeb then heard his mother calling from outside the residence, "Troy, Troy, call 911, he shot me."[17] Zeb went outside to attend to his mother and knelt down beside her, asking her what was going on. Zeb stood up as the defendant approached again and asked Zeb, "where is she?" Zeb told defendant to "just go away, leave us alone."[18] At that, the defendant raised his gun and pointed it at Zeb and told him that he should just go back to wherever he had come from.[19] As various neighbors were beginning to come out, defendant called out one last time, "Kimberly, I'll be waiting for you at home,"[20] then got back in the van and sped away.
Evelyn told Zeb to call 911, which he did, and emergency medical personnel and police were dispatched to the area. When they arrived, Evelyn immediately gave them a description of the man who shot her and her husband. Evelyn survived her injuries, but required numerous surgeries for the damage sustained by her internal organs. Troy Salone was pronounced dead at the scene.[21]
Meanwhile, from the safety of Steven Andrade's neighboring home, Kimberly Zimmerman called 911 to report that her ex-boyfriend, Donald Leger, had kidnapped her at gunpoint. After hearing gunshots, she told the dispatcher that she feared he may have shot himself. Later, she told the dispatcher that she believed the defendant had been shooting at her.[22]
The police were already on the way to the Verdunville area when they encountered the blue van speeding away. Defendant led police on a high-speed chase for approximately 30 miles through cane fields and back roads. Officers from various jurisdictions, including the St. Mary Parish Sheriff's Office, the Franklin Police Department, and the Morgan City Police Department participated in the chase. At *121 times, defendant turned out the headlights on the van, hoping to elude the authorities. Eventually, defendant pulled into the parking lot of the Morgan City Police Department and was arrested without incident.
Over the course of the ensuing day and a half, defendant made five inculpatory statements while in police custody, four to the police and one recorded telephone conversation with his brother. These statements were introduced in evidence and played for the jury. In addition, the state presented evidence seized from the defendant's residence, the blue van and the crime scene, including a used pregnancy test seized from the defendant's house, a glove seized from the rear of the defendant's truck, Zimmerman's black sweater and a picture of Zimmerman's children recovered from the Salone's yard. No gun was ever recovered but officers participating in the pursuit of the defendant saw the defendant throw something out of the van's window during the high speed chase which caused sparks on the road. In one of his statements, the defendant claimed he threw the gun in the woods and threw the knife on the road. After considering all of the evidence presented, the jury unanimously found the defendant guilty of first degree murder.
In the penalty phase of this trial, the state reintroduced all of the testimony and evidence admitted in the guilt phase of trial. The state and the defense jointly stipulated to the defendant's prior criminal record, which included prior convictions for simple burglary, forgery, disturbing the peace by fighting, simple battery, theft of over $500 and attempted simple burglary. The state then presented the testimony of Evelyn Salone, the victim's wife; Zeb LeBlanc, the victim's stepson; Diana Salone, the victim's mother; Danette Boykin, the victim's sister-in-law; Ricky Cook, the defendant's employer, who testified as to individual characteristics of Troy Salone and the impact his death had on their lives and the lives of their family members. Finally, the state presented Kimberly Zimmerman, who testified that since the defendant's incarceration for first degree murder, he had written her a letter, urging her not to testify and threatening her. The letter itself was admitted in evidence for the jury's consideration.
The defense presented the testimony of four witnesses in the penalty phase. T.A. Masena testified as to the defendant's character as a trustee when he was previously incarcerated. Kenneth LeBlanc and Kenneth Bacque testified about a prison ministry group to which they belong and how they met the defendant through that group during his previous incarcerations. They testified as to their knowledge of the defendant's strong faith and desire for a wife and children. LeBlanc also testified about the lack of parental support that the defendant received. Finally, Mark Leger, the defendant's brother, testified about their family life with an alcoholic and abusive father, culminating in the defendant being kicked out of the home at the age of 16 years. Mark Leger told the jury that the defendant did not have parental support and encouragement but had a strong faith and desire to live a productive life with a wife and children. Mark Leger also informed the jury that one of the defendant's prior convictions for simple battery concerned a fight the defendant had with his father where they were both arrested.
Following the penalty phase, the jury unanimously recommended that the defendant be sentenced to death, after finding that the defendant: (1) was engaged in the perpetration or attempted perpetration of an aggravated kidnapping or second degree kidnapping; (2) engaged in the perpetration or attempted perpetration of an aggravated burglary; and (3) knowingly *122 created a risk of death or great bodily harm to more than one person. La. C.Cr.P. art. 905.4(A)(1),(4). Thereafter, the trial court formally sentenced the defendant to death by lethal injection.
The defendant now appeals his conviction and sentence urging 32 assignments of error.[23]

LAW AND DISCUSSION

Defendant's Inculpatory Statements

Assignments of Error 1-6
In these assignments of error, the defendant asserts that inculpatory statements made while in police custody were obtained in violation of his right to remain silent and his right to obtain counsel. In addition, the defendant claims that the statements were involuntary based on his physical and mental conditions. Finally, the defendant claims that the statements, admitted at trial, should have been suppressed, and that their consideration by the jury is reversible error.
Five custodial statements are at issue in this argument.[24] The state gave pretrial notice of these statements to the defense pursuant to La.C.Cr.P. art. 768.[25] Prior to trial, the defense filed a motion to suppress statements and evidence. Acting pro se, the defendant filed several motions to suppress. After hearings held April 12, 2002 and May 31, 2002, the trial court denied the motions to suppress and determined that the custodial statements at issue were admissible in evidence at trial.[26]
Trial courts are vested with great discretion when ruling on a motion to suppress. Consequently, the ruling of a trial judge on a motion to suppress will not be disturbed absent an abuse of that discretion. State v. Long, 2003-2592 p. 5 (La.9/9/04), 884 So.2d 1176, 1179-1180, cert. denied, 544 U.S. 977, 125 S.Ct. 1860, 161 L.Ed.2d 728 (2005). Although not required to do so, an appellate court may review the testimony adduced at trial, in addition to the testimony adduced at the suppression hearing, in determining the correctness of the trial court's pre-trial ruling on a motion to suppress. State v. Sherman, XXXX-XXXX (La.10/29/04), 886 So.2d 1116; State v. Green, XXXX-XXXX p. 11 (La.5/22/95), 655 So.2d 272, 280.
A chronology of the events and statements pertinent to these assignments of error reveals that, after the high speed chase, the defendant was arrested in the Morgan City Police Department parking lot by the St. Mary Parish Sheriff's Office at 12:50 a.m. on December 11, 2001.[27] The defendant exited the blue van with his hands in the air. At that time, the defendant was placed under arrest, handcuffed and informed of his constitutional rights. Sgt. Driskell and Sgt. Honse of the St. Mary Parish Sheriff's Office testified that the defendant twice interrupted Sgt. Driskell's recitation of rights to inform Sgt. Driskell that he both knew and understood his rights.[28]
*123 The record shows that Sgt. Driskell advised the defendant of his constitutional rights from memory at the time of the defendant's arrest, as follows:
... You have the right to remain silent; anything you say can and will be held against you in a court of law; you have the right to an attorney and have one with you while you are being questioned. If you cannot afford one, one will be appointed before any questioning, if you wish. With these rights in mind, you can stop answering any questions or the making of any statement until you talk to your attorney.[29]
Other than acknowledging that he understood his rights, the defendant did not make any statements at the time of his arrest. In fact, the defendant did not speak at all as Sgt. Honse transported him to the St. Mary Parish jail.
After he was transported to the jail, the defendant was placed in an interview room. Detective Riviere of the St. Mary Parish Sheriff's Office, accompanied by Detective Smith, brought a copy of a rights form into the interview room and sat down. Before Detective Riviere could review the constitutional rights on the form with the defendant, the defendant stated he had nothing to say.[30] Detective Riviere did not question the defendant and immediately left the room.
Detective Smith, who was keeping an eye on the defendant in the interview room, watched as the defendant got out of his chair and started running. Detective Smith initially thought the defendant was trying to escape. Instead, the defendant rammed his head into a wall. According to Detective Smith, the impact caused the defendant to leave his feet and land on his stomach. Detective Smith checked the defendant for vital signs and noted that the defendant lost consciousness for a little while. Upon regaining consciousness, the defendant made the unsolicited comment to Detective Smith, "she killed my baby."[31] Detective Smith stayed with the defendant until the ambulance arrived.
Acadian Ambulance records reflect that defendant's vital signs were taken at 2:15 a.m.[32] An EMT assessed a slight redness to the defendant's forehead, but no swelling. After being examined by medical personnel and offered treatment and transport, the defendant adamantly refused to go to the hospital.[33]
At approximately 4:00 a.m., the defendant was transferred to the jail at the Franklin Police Department.[34] Lt. Guillory of the Franklin Police Department, who oversees the jail, testified that the defendant was closely monitored on suicide watch due to his action of ramming his head into a wall.[35] Subsequently, the defendant made five statements which were *124 either videotaped or audiotaped which are at issue in these assignments of error.

Right to Remain Silent
With this factual background in mind, the court will now examine four of the statements to determine whether the statements were obtained in violation of the defendant's expressed right to remain silent.[36]
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court
promulgated a set of safeguards to protect the there-delineated constitutional rights of persons subject to custodial police interrogation. In sum, the Court held in that case that unless law enforcement officers give certain specified warnings before questioning a person in custody,[37] and follow certain specified procedures during the course of any subsequent interrogation, any statement made by the person in custody cannot over his objection be admitted in evidence against him as a defendant at trial, even though the statement may in fact be wholly voluntary.
Michigan v. Mosley, 423 U.S. 96, 99-100, 96 S.Ct. 321, 324-325, 46 L.Ed.2d 313 (1975). In addition to showing that the Miranda requirements were met, the state must "affirmatively [show] that [the statement or confession] was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises" in order to introduce into evidence a defendant's statement or confession. La. R.S. 15:451.
The Miranda holding "protects an individual's Fifth Amendment privilege during incommunicado interrogation in a police-controlled atmosphere." State v. Taylor, XXXX-XXXX p. 6 (La.1/14/03), 838 So.2d 729, 739, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). This court has held that "Miranda does not require that a defendant exercise his right to remain silent by any particular phrasing. In fact, the Supreme Court in Miranda stated, if the individual `indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" Taylor, XXXX-XXXX p. 6, 838 So.2d at 739.
"When a defendant exercises his privilege against self-incrimination the validity of any subsequent waiver depends upon whether police have `scrupulously honored' his right to remain silent." Taylor, XXXX-XXXX p. 6, 838 So.2d at 739, citing Mosley, 423 U.S. at 104, 96 S.Ct. at 326. The Court identified the critical safeguard in the right to remain silent as a person's "right to cut off questioning." Mosley, 423 U.S. at 103, 96 S.Ct. at 326. "Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." Mosley, 423 U.S. at 103-104, 96 S.Ct. at 326.
*125 Whether the police have "scrupulously honored" a defendant's "right to cut off questioning" is a determination made on a case-by-case basis under the totality of the circumstances. Mosley, 423 U.S. at 104-106, 96 S.Ct. at 326-328; Taylor, XXXX-XXXX p. 7, 838 So.2d at 739; State v. Brooks, 505 So.2d 714, 722 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
Factors going into the assessment include who initiates further questioning, although, significantly, police are not barred from reinitiating contact, ... whether there has been a substantial time delay between the original request and subsequent interrogation; whether Miranda warnings are given before subsequent questioning; whether signed Miranda waivers are obtained; and, whether the later interrogation is directed at a crime that had not been the subject of the earlier questioning. Michigan v. Mosley, 423 U.S. at 105, 96 S.Ct. 321, 46 L.Ed.2d 313; Brooks, 505 So.2d at 722; [State v.] Harper, 430 So.2d [627,] at 633.
Taylor, XXXX-XXXX p. 7, 838 So.2d at 739; see Mosley, 423 U.S. at 103-104, 96 S.Ct. at 326.

First Statement
Approximately 13 hours after his arrest at 12:50 a.m. on December 11, 2001, the defendant was interrogated by the Franklin Police Department. Lt. Guillory and Agent Rupert, the defendant's parole officer, participated in questioning that lasted approximately two hours, with the final 28 minutes, from 12:45 p.m. until 1:13 p.m., recorded on videotape. Agent Rupert testified at the suppression hearing that he advised the defendant of his constitutional rights in the presence of Lt. Guillory.[38] Lt. Guillory testified that Agent Rupert reminded the defendant of his constitutional rights and that the defendant acknowledged that he understood them.[39] The videotape, for which there is no written transcript, reflects that Agent Rupert asked the defendant whether he had been advised of his rights. The video shows that the defendant nodded his head slightly to signify "yes."
The defendant told Lt. Guillory and Agent Rupert that he and his girlfriend had purchased a pregnancy test based on her statement to him that she might be pregnant, that he did not know whether or not she was pregnant and that she had told him she did not want the baby. The defendant also stated that he had just "lost it." He indicated to the officers that he did not understand what happened or why he did what he did. When pressed for further details, the defendant told Lt. Guillory and Agent Rupert that he did not want to talk about it. Despite the defendant's stated reluctance to discuss the matter, Lt. Guillory and Agent Rupert continued to question him. The defendant subsequently stated that his life was over and that he "knew where he was going." At one point, the defendant stated that he just wanted to die. When Lt. Guillory and Agent Rupert sought details, the defendant reiterated several times that he did not want to talk about it.
The videotape shows that throughout the interview, the defendant gave unresponsive answers to questioning, placed his head down on the desk or in his hands and *126 cried intermittently. The audio of the videotape is hard to understand in parts due to the defendant's lowered head and muttered speech. Throughout the questioning, however, it is possible to hear the defendant repeatedly stating that he did not want to talk. No waiver of rights form was generated during this interview.
After approximately 28 minutes, when the defendant finally became totally unresponsive to Lt. Guillory and Agent Rupert, they left and turned the interrogation over to Chief McGuire of the Franklin Police Department and Detective Sonnier of the St. Mary Parish Sheriff's Office. Chief McGuire and Detective Sonnier had been watching the earlier interrogation through a closed circuit video monitor. When the new interrogators entered the room, the defendant initially failed to respond to them. During the next portion of the videotaped interview, lasting from approximately 1:13 p.m. until 1:40 p.m., no signed waiver of rights form was obtained. Eventually, the defendant answered the officers' questions regarding his relationship with Zimmerman, the suspected pregnancy, and his bewilderment at why he did the things that he did. The defendant reiterated his belief that his "life is over." Throughout this portion of the interview, the defendant again stated multiple times that he "did not want to talk about it" and "did not want to talk anymore." Finally, the defendant stated "I want to go back to my cell ... I'm through answering questions. Can I leave?" At this point, the police terminated the interview.
We note that Agent Rupert testified at the suppression hearing that his interview with the defendant lasted two hours. Since only 28 minutes of his discussion with the defendant was videotaped, it is possible that the defendant was informed of his Miranda rights shortly before the video portion of the interview began. Regardless, the videotape shows that, when asked if he understood his rights, the defendant nodded "yes." We also note that the state concedes in brief that only the first part of the interview is admissible, up to the point where the defendant stated that he did not want to talk anymore. The state agrees that the defendant's right to remain silent under Miranda was violated at some point and that the police response of substituting interrogation teams to continue the questioning did not "scrupulously honor" the defendant's invocation of his right to cut off questioning.[40]
We agree with the state's concession. We find that Lt. Guillory and Agent Rupert failed to honor the defendant's invocation of his right to remain silent and that the defendant's statements during this portion of the interview, after he first invoked his right to remain silent, should not have been admitted in evidence. In addition, we find that the continued interrogation by Chief McGuire and Detective Sonnier did not "scrupulously honor" the defendant's invocation of his constitutional right to remain silent. The police practices on display here are specifically proscribed in Mosley, "where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." Mosley, 423 U.S. at 105-106, 96 S.Ct. at 327. We hold that the trial court abused its discretion in failing to suppress the portion of the first videotaped statement after the point where the defendant first invoked his "right to cut off questioning" and in finding *127 that the first statement was admissible in its entirety.
Our finding of error does not end our inquiry, however. This court must also determine whether the error was harmless, which shall be discussed later in the analysis of these assignments of error. In addition, we must examine the subsequent statements obtained from the defendant while in custody to determine whether the state's failure to honor the defendant's right to remain silent for this first statement had a coercive effect on the latter statements.

Second Statement
On December 11, 2001, at approximately 8:30 p.m.,[41] the defendant was formally booked in the Franklin Police Department booking room by Lt. Guillory and a videotape was made during that encounter. Lt. Guillory explained at trial that the reason for the delayed booking was the defendant's action of ramming his head into the wall at the St. Mary Parish jail, followed by complaints that his head hurt. Lt. Guillory had the jail nurse attend to the defendant, cleaning some cuts on his face and ear[42] and giving him liquid Tylenol. In addition, the defendant's subsequent statements that he wanted to die and that his life was over caused the police to put the defendant on monitored suicide watch, making his sleeping, eating and drinking routines noteworthy to his jailers.[43] On the videotape, Lt. Guillory is heard stating that he had not wanted to wake up the defendant earlier.
During the booking procedure, which lasted less than half an hour, Lt. Guillory presented the defendant with a waiver of rights form and had him read it to himself. Lt. Guillory specifically informed the defendant that he did not intend to obtain a statement from the defendant at that time, but wanted to ensure that the defendant knew and understood his rights. Lt. Guillory read aloud from the waiver portion of the form, which states:
I have been read this statement of my rights and understand what my rights are.[44] I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats or coercion has {sic} been used against me.[45]
After being read the waiver portion of the form, the defendant responded, "Yeah, I'm gonna need a lawyer, though." Lt. Guillory then explained to the defendant the procedure in court wherein the defendant could obtain court-appointed counsel if indigent, or could hire *128 an attorney if he had the money to do so. Significantly, Lt. Guillory concluded his explanation by stating something similar to "there's nobody that says you can't call a lawyer or something." The defendant did not continue the discussion regarding counsel, nor did he request counsel at that time.
During the remainder of the booking procedure, Lt. Guillory did not question the defendant about the crime. Instead, Lt. Guillory completed the regular booking procedures of taking a mug-shot photograph and obtaining fingerprints. Lt. Guillory offered the defendant a shower or a shave, and offered him food. The defendant wanted to know if anyone had called for him and Lt. Guillory stated he did not know.
Unsolicited, the defendant asked Lt. Guillory, "did anybody die?" Lt. Guillory responded, "yeah." Lt. Guillory told the defendant he would not speak to any of the defendant's family members who may have called until the defendant said that he could. The videotape shows the defendant musing that he would get "life, maybe worse." Lt. Guillory again offered the defendant food or asked if the defendant would like to speak with a priest or someone else. The defendant stated that he just wanted to lie down.
In assessing whether the second statement was obtained in violation of the defendant's right to remain silent, or whether the interrogation resulting in the first statement tainted this second one, we note that the time delay between the first statement and the booking procedure was almost six and a half hours and after the defendant rested. Moreover, the booking procedure is an administrative interview, unavoidable to all inmates. This was not state-initiated contact meant to interrogate the defendant about the facts of the crime. Indeed, Lt. Guillory specifically informed the defendant that he was not there to obtain a statement. The videotape shows the defendant sitting on a bench, initially shackled but later unshackled to effectuate the picture taking and fingerprinting. Lt. Guillory is sitting at a nearby computer, dressed in casual clothes and whistling or humming. Miranda warning were again discussed with the defendant, who signed the waiver of rights form.
Significantly, it was the defendant who initiated asking questions about the crime. We also note that Lt. Guillory did not follow the defendant's lead and begin interrogating him. Lt. Guillory merely answered the questions asked independently by the defendant. "Police are not obliged to ignore spontaneous and unsolicited statements by someone in custody, as long as those statements do not result from police-initiated custodial interrogation or questioning `reasonably likely to elicit an incriminating response.'" State v. Koon, XXXX-XXXX p. 7 (La.5/20/97), 704 So.2d 756, 762, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997).
The rights form which the defendant had just discussed stated that the charges at that time were carjacking and aggravated kidnapping.[46] During the defendant's earlier interrogation with Chief McGuire, he was informed that the woman the defendant shot was going to live and was currently in the hospital. Lt. Guillory now confirmed for the defendant what the defendant almost certainly knew for himself, that the bullet fired into the head of Troy Salone had killed him.
After reviewing the totality of the circumstances surrounding the obtaining of the second videotaped statement from the defendant, we find that the defendant's *129 statements were not the product of custodial interrogation. Thus, the Miranda protections were not implicated. Even so, the defendant was again instructed as to his constitutional rights and made a valid waiver of his right to remain silent. Any statements made by the defendant were spontaneous and self-initiated. The trial court did not abuse its discretion in finding this statement to be admissible in evidence.

Third Statement
The next morning following the defendant's booking, December 12, 2001, Captain Broussard of the Franklin Police Department arrived at work at the jail at 7:30 a.m. On his way to check the video monitor that had been set up to record the defendant's activities while in his cell,[47] he saw the defendant sitting on the floor of his cell by the door. In casually conversing with the defendant, Captain Broussard observed that "he was making little statements about what was going on and I had asked him if he was willing to make any statements on the record." When the defendant indicated that he would, Captain Broussard contacted Chief McGuire, who accompanied Captain Broussard back to the defendant's cell.[48] Chief McGuire entered the defendant's cell, brought him coffee, sat on the bed next to the defendant, and obtained the defendant's statement.[49] Neither officer recited Miranda warnings to the defendant nor was a waiver of rights form signed at this time.
The audio recording of this interview is mostly inaudible. A time-lapse videotape of Captain Broussard's and Chief McGuire's encounter with the defendant indicates that this interview concluded at approximately 9:19 a.m. Thus, the conversation with Captain Broussard and questioning by Chief McGuire lasted less than two hours. At trial, Chief McGuire testified to the content of the unrecorded statement as follows:
He told me that he had found out that Kimberly possibly was pregnant, and that he had left a note, wanting to speak to her, the day before the incident, on the van at Wal-Mart. Later on her and him  her and Kim  him and Kim went and retrieved a pregnancy kit from Wal-Mart. He said that he didn't know what kind to pick up and had actually picked up the wrong thing, so she had to pick it up. And I asked him how much it cost, and he said, approximately ten dollars. They retrieved the pregnancy test and went to his house.
He said that after the pregnancy test was conducted, she didn't tell him or show him whether it was positive or negative.
She wanted to leave; he got angry. That's when he had some tie-wraps in his bedroom; he secured her with the tie-wraps.
He said that there was a roll of tape on the top of his refrigerator that was used *130 for packing. He took a knife off the kitchen sink, cut the tape, put a piece of tape on her mouth because she was yelling and screaming and he didn't want anyone to hear, so he taped her mouth, put her in the van, and went to drive away so that they could find a quiet place to talk.
I asked him where he retrieved the gun from and he said that the gun belonged to Kimberly; that when he was putting her in the van, pushing her across to the passenger's side, that she had a purse in between the two seats that was tied with a string, that it had fallen open and the gun had fallen on the floor and he took the gun and put it in his pants; then drove to the Centerville area which he was familiar with, because he had gone fishing in that area.
Would you like for me to continue?
Prosecutor: Yes. Please.
When he drove to that area he said that Kimberly didn't want to talk to him, and he kept wanting to talk to him (sic).
He did remove the tape from her mouth, he said, and he balled it up, didn't remember if he had thrown it on the floor of the van or if he had thrown it out of the window.
He said that somewhere in the Centerville area, after they had crossed the bayou, there was a pumping station near the area in which he was going.
The van had slowed down, and she opened the van, and she had gotten loose from her tie-wraps, and jumped out of the van.
He said that while the van was still moving, he jumped out of the same door she did, and the van continued rolling and hit a mailbox. He jumped in the van, stopped the van, and then he started looking for her. He said that there was all kinds of people, and people were yelling and screaming, and then he thought he heard Kimberly.
A lady was standing there and he was asking, where was Kim, where was Kim, and she wouldn't answer, and the gun went off.
He said that then he saw a male subject come to the door of that house, and he thought that he heard something in the house that he thought was Kim, and he proceeded into the house.
He said that the male subject reached over towards  over a table towards the sofa, and at that point he fell on the sofa. He didn't say that he had shot him, he just said that the man fell on the sofa.
He saw that the back door was open, and he thought it was Kim, so he proceeded out the back and was looking for Kim.
I asked him what he had done with the gun and he told me that he threw it in the wooded area behind that home.
Then he heard sirens, so he jumped into the Police Car  back in the van, and took off. And he had some work gloves on, some Black Dot work gloves, and he threw the Black Dot work gloves and the knife out somewhere around Calumet.
Ran from the Police and pulled into the Morgan City Police Department and that is where he was apprehended.[50]
Chief McGuire testified that what the defendant told her was consistent with other information received by the police, except in a few particulars. For instance, Chief McGuire had received information that the defendant had purchased the gun from someone at his *131 work and that it did not belong to Kimberly Zimmerman.[51]
In assessing whether the third, unrecorded, statement was obtained in violation of the defendant's right to remain silent, we note that this statement was obtained almost 18 hours after the conclusion of the defendant's interrogation of the previous day by police. During that time period, the defendant slept, ate and was free from further questioning, all as recorded on the time-lapse videotape. We find that any coercive effect from the earlier police interrogation had dissipated by the time Captain Broussard began conversing with the defendant.
No evidence indicates that defendant received a new set of Miranda warnings before Captain Broussard and Chief McGuire interviewed him in the cell, however, the defendant, a veteran of the criminal justice system, had received a full set of warnings from Lt. Guillory at booking on the previous evening, and the advice was presumably fresh in his mind a few hours later when he agreed that he would talk to Captain Broussard. We find that the defendant knew and validly waived his constitutional rights based on the fact that he had been informed of them on several occasions the previous day and indicated unquestionably that he understood them. We find that the defendant was clearly invoking his right under Miranda to control the time at which questioning would occur and the topics which would be discussed by his agreement to give a statement to Chief McGuire. After reviewing the totality of the circumstances, we find that there was no abuse in the trial court's determination that the third, unrecorded, statement was admissible in evidence.

Fourth Statement
After the conversation in the holding cell, Chief McGuire asked the defendant if he would like to make a recorded statement. The defendant agreed. After taking an approximate 40 minute break so that the interrogation room could be set up, and during which time the defendant was allowed to take a shower and spend some time outside,[52] the defendant gave a videotaped confession at 10:00 a.m. in the presence of Chief McGuire, Captain Broussard and Lt. Guillory.
At the suppression hearing, Chief McGuire testified that Miranda warnings were given prior to obtaining the recorded statement.[53] She also testified that the defendant signed a consent to search during the taking of the statement.[54] Captain Broussard testified that Lt. Guillory advised the defendant of his rights.[55] Lt. Guillory testified that he advised the defendant of his constitutional rights and that another rights form was filled out, along with a consent to search.[56]
The videotape shows that the defendant initially expressed that he did not want to talk anymore, that he wanted to rest his mind. Chief McGuire stressed the need to get the defendant's statement on the record so that the police could then check the information the defendant gave them. Lt. Guillory reminded the defendant about the rights they had discussed the night before and specifically informed the defendant of his right to remain silent. As Captain Broussard put a cassette tape in the tape recorder, the defendant informed them *132 that he did not feel comfortable. When the officers tried to ascertain what aspect of the interview made the defendant uncomfortable, specifically questioning the defendant's feelings about the audiotape, the defendant responded that he just did not know what to do.
The police reiterated the need to get the defendant's statement on the record and urged the defendant to read over the waiver of rights form. The defendant stated he did not want to spend the rest of his life in prison and indicated that he knew that would happen. The defendant asked the officers to confirm that the woman he shot was okay and asked if the man he shot had been her husband. When told that the man was the woman's husband, the defendant began to cry and stated he did not even know the man he shot. He was again urged to read over his rights form so that the police could search for the evidence that would support his story.
At this point, the videotape reflects that the defendant agreed to give a written consent to search so that the officers could search his house. When asked specifically if he was refusing to sign the waiver of rights form, the defendant stated that he did not want to talk. The police told the defendant that in order to obtain a written consent, he would also have to "do his rights," too. Thereafter, the defendant appeared to want the officers to search his house to find the evidence that would corroborate the information he was telling them so that the officers could see he was telling the truth.
When the rights form was presented to him, the defendant was asked by Captain Broussard whether he wanted a lawyer with him "right this second." The defendant responded "I know I need to see one." He then went on to say he just did not know what was going to happen to his life. Captain Broussard told the defendant that the judge would appoint a lawyer for him. The defendant did not raise the issue of counsel again but answered the officers' questions implicating himself in the aggravated kidnapping of Zimmerman and the shooting of Evelyn and Troy Salone.
When the officers concluded the interrogation, they again attempted to have the defendant sign the waiver of rights form. Captain Broussard told the defendant that the rights on the form were the same ones that Lt. Guillory had read to him. The defendant indicated "okay" and signed the waiver of rights.[57] The entire interview lasted from 10:00 a.m. until approximately 10:35 a.m.
This videotaped statement was obtained less than an hour after the defendant made an unrecorded statement to Chief McGuire and Captain Broussard. In the interim, the defendant was allowed to refresh himself with a shower and a brief respite outside. The defendant was reminded of the Miranda provisions which had been thoroughly discussed the previous evening with Lt. Guillory and Lt. Guillory specifically reminded him of his right to remain silent prior to this interview. When the defendant expressed his discomfort with the situation, the officers tried to ascertain the source of the defendant's discomfort. The defendant informed the officers that his discomfort stemmed from the fact that he did not know what to do, rather than his explicit indication that he was invoking his right to remain silent. The defendant was presented with another waiver of rights form, the same as the one he had gone over with Lt. Guillory the previous evening, and was urged to review it.
*133 The defendant offered to sign a consent to search because he appeared eager for the police to collect the evidence which would support the information he had already told them. The police told the defendant that a waiver of rights had to be done at the same time as his voluntary consent to search. The defendant now complains that this trickery coerced him into making his recorded statement. However, "[p]loys to mislead a suspect ... that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns." Illinois v. Perkins, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990). We do not find that the officers' statement to the defendant rises to the level which would compel him to speak. Here, the defendant was clearly informed and indicated his understanding that he could remain silent, could cut off questioning at any time, could request an attorney during questioning, or could waive his right to remain silent and speak with the officers. The defendant chose to continue to speak with the officers.
Nor do we find merit in a supplemental argument submitted by the defendant for our review. The defendant argues that the unrecorded first statement that day, at which no new recitation of Miranda was performed, followed by the recorded statement at which the waiver form was signed after the conclusion of the recorded statement violated the "question first" protocol denounced in Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). We find the circumstances presented here to be distinguishable from those at issue in Seibert.
In Seibert, officers questioned a female murder suspect in a two-stage interview. In the first interview, the officer purposely failed to give the defendant, Seibert, Miranda warnings. The officer questioned Seibert for 30 to 40 minutes and obtained a confession. After a 20 minute break, the officer returned and advised Seibert of her rights under Miranda. A signed waiver of rights was obtained, and the officer resumed questioning, confronting Seibert with her pre-warning confession. By use of this interrogation protocol, the officer obtained a post-warning confession which basically repeated Seibert's earlier statement. Seibert moved to suppress both her pre-warning and post-warning statements. The trial court in that case suppressed the pre-warning statement only, admitting Seibert's post-warning statement at trial.
The case ultimately was reviewed by the Supreme Court, which held that both the pre-warning and post-warning statements were inadmissible at trial.[58] The Court found that a midstream recitation of Miranda warnings could not comply with the object of Miranda, i.e. that the "warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture."[59] As the Court stated:
Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.[60]
In the present case, the defendant had been advised of his Miranda rights at least three times before the December 12, 2001 interrogation: first, upon arrest by Sgt. Driskell, just after midnight on December 11th; second, later that day by Parole Officer Rupert; and third, later still *134 on the evening of December 11th with Lt. Guillory, at which point the defendant signed a waiver of rights form. In addition, Lt. Guillory advised him of his right to remain silent immediately prior to the defendant's recorded confession on December 12th. Consequently, the defense's claim that the defendant may not have understood that he had the right to remain silent until after making his December 12th recorded confession is disingenuous. The defendant had been Mirandized repeatedly and had previously signed a waiver of rights form. Moreover, considering the defendant's criminal record as stipulated to at the penalty phase, the defendant was no stranger to the criminal justice system and his constitutional rights. We find no merit in the defendant's supplemental argument regarding these statements.

Right to Assistance of Counsel
The defendant points to two instances during police interrogation when the issue of legal representation arose. The first instance occurred during booking with Lt. Guillory. After the defendant signed the waiver of rights form, Lt. Guillory read aloud the waiver portion which included the statement "I do not want a lawyer at this time."[61] The videotape of the booking reveals that the defendant immediately responded "yeah, I'm gonna need a lawyer, though." Lt. Guillory explained the procedure about obtaining appointed counsel as opposed to hiring one. Nothing further on the issue of counsel arose during the booking procedure.
The second instance occurred during the fourth, recorded statement, when Captain Broussard sought the defendant's signature on the second waiver of rights form. Captain Broussard asked the defendant to affirm that he did not want a lawyer at that moment. The defendant responded that he knew he needed to see one but no temporal aspect attached to this statement.
Miranda requires that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to the suspect before questioning begins. Id., 384 U.S. at 469-473, 86 S.Ct. at 1625-1627. When an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).
One of the first questions to be determined is whether particular police conduct constitutes "interrogation." In Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court concluded that the goals of the Miranda safeguards could be effectuated if those safeguards extended not only to express questioning, but also to "its functional equivalent." Innis, 446 U.S. at 301, 100 S.Ct. at 1689. "Functional equivalent" of questioning was explained as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Arizona v. Mauro, 481 U.S. 520, 526-527, 107 S.Ct. 1931, 1935, 95 L.Ed.2d 458 (1987), citing Innis, 446 U.S. at 301, 100 S.Ct. at 1689.
In addition, a reviewing court must determine whether the accused has *135 "unambiguously request[ed]" counsel "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" in order to cease custodial interrogation. Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994); State v. Payne, XXXX-XXXX p. 12 (La.12/4/02), 833 So.2d 927, 937. In Payne, this court held the
[i]nvocation of the Miranda right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the cessation of questioning is not required. The suspect must articulate his desire to have counsel present with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.
Payne, XXXX-XXXX p. 10, 833 So.2d at 935 (citations omitted; emphasis in original).
With these requirements in mind, we find that the defendant was not subject to "interrogation" at the time of his booking with Lt. Guillory. Lt. Guillory's words and actions at that time were not the "functional equivalent" of questioning, but were rather words or actions on the part of the police normally attendant to arrest and custody. In fact, Lt. Guillory informed the defendant that he was not there to take a formal statement. Such a procedural interview should not be equated with custodial questioning about the facts of the offense. Moreover, we find that the statement which the defendant made during booking regarding counsel did not articulate a desire to have counsel present such that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. Rather, we find that the statement was more akin to a realization by the defendant that at some point in the future he would require the services of counsel.
Likewise, the defendant's comment during interrogation to Captain Broussard that "I know I need to see one [a lawyer]" did not amount to an unambiguous request for counsel that would indicate to a reasonable police officer that the defendant was asking for counsel at that time. Similar to his statement at booking, the defendant's announcement appears to affirm the defendant's understanding that he would ultimately require the services of a lawyer. There was nothing in the defendant's announcement that he was requesting the services of counsel at that item nor that he wanted to communicate with the police solely through counsel. We find no abuse of the trial court's discretion in failing to suppress the defendant's statements on this basis.

Fifth Statement
The defendant complains that the police "secretly" recorded a telephone conversation between the defendant and his brother, Mark Leger, which constituted a "functional equivalent" of interrogation and violated his invocation of the right to counsel. The record shows that following the recorded statement of December 12, 2001 ("Fourth Statement" discussed herein), attorney Gary LeGros arrived at the police station to meet with the defendant. LeGros specifically advised the police that the defendant was invoking his right to counsel and that further questioning of the defendant by the police was prohibited.
Thereafter, Mark Leger returned a phone call which Lt. Guillory had placed at *136 the request of the defendant. The recording of the conversation shows that when the call came in, Lt. Guillory asked Mark whether he wanted to speak to the defendant by telephone or whether he would prefer to come down to the police station. Mark opted to speak to his brother on the telephone. Lt. Guillory advised Mark that the telephone call would have to be on speaker phone. Mark affirmed that method of communication would be "alright" and "however he wanted to do it, that's fine."[62]
Lt. Guillory testified at the suppression hearing that he also informed Mark that the telephone conversation would be recorded:
Normally, under circumstances, we don't let anybody talk to inmates, but I figured that he [the defendant] needed to talk to a family member. So, I went to my office, opened my office up, got him, brought him into my office, explained to his brother that it would be on speaker phone, explained to him that the phones are recorded. All of the phones are recorded at P.D. Let him talk to his brother. I stepped out of my office and left a crack in the door about like that (indicating) and let him talk to his brother.[63]
Captain Broussard affirmed that all of the normal business telephone lines in the Franklin Police Department are recorded on a tape machine.[64]
At trial, Lt. Guillory testified that he told Mark both that the line was recorded and that the call would be on speaker phone so that the officer could hear it.[65] On cross-examination, he conceded he did not tell the defendant that the line was recorded; however, he stated that the telephone itself is marked as a recorded line.[66] Although Mark testified he heard a tone on the line that he assumed was the telephone being taken off of the speaker phone,[67] Lt. Guillory disputed that fact, testifying that the receiver of the telephone was never picked up.[68] When asked whether he thought the defendant had an expectation of privacy in the conversation, Lt. Guillory questioned how the defendant could have thought he was having a private conversation with the conversation being on speaker phone, with Lt. Guillory looking at him through the door and "hearing the whole conversation."[69]
In this telephone conversation, the defendant admitted he had committed the crimes with which he was charged. He expressed sorrow and despair. He also instructed his brother to sell his truck and whatever other possessions he owned in order to provide the defendant with money.
The question presented here by counsel, whether police have right to record conversations between a suspect in custody and a family member, was answered in Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). In Mauro, the wife of a murder suspect expressed a desire to speak to him while he was in custody. The police eventually acquiesced but informed both the suspect and his wife that they could only speak together if an officer were present in the room to observe and hear what was going on. The *137 officer placed a tape recorder in plain sight on the desk in the room and taped the conversation, which was later played to the jury at trial. The Mauro defendant sought suppression of the recording on the ground that it was a product of police interrogation in violation of his expressed right to deal with the police only through counsel.
The Mauro Court held that under both Miranda and Innis, the suspect was not subjected to interrogation or its "functional equivalent."[70] The Court found that the tape recording showed that the police asked no questions about the crime or the suspect's conduct nor was it suggested or supported by evidence that the police's decision to allow the suspect's wife to see him "was the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation."[71] The Court did not find improper the presence of the officer during the conversation between the suspect and his wife, nor the fact that the police recorded the conversation.[72] The Court determined that the weakness of the suspect's Miranda claim was underscored by examining the situation from the defendant's perspective, as required by Innis. In other words, the Court "doubt[ed] that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way."[73]
We find that the defendant's claim regarding the admissibility of the tape recording of his conversation with his brother is controlled by Mauro and the law cited therein. We find that the defendant was not subject to interrogation or its functional equivalent by being allowed to speak with his brother on the telephone at the police station. The actions of the police in permitting the telephone conversation to occur were not coercive. As in Mauro, the defendant's relative was informed that the conversation would be overheard by others. Just as the Mauro defendant could see the tape recorder, the defendant had only to glance down to see the notation that the telephone was a recorded line. In addition, the defendant had to be aware that Lt. Guillory was stationed just outside the cracked door and was listening to the entire conversation. Thus, the statement obtained by the police by recording the telephone conversation was not obtained in violation of the defendant's Miranda rights. We find no abuse of the trial court's discretion in failing to suppress this statement at trial.

Voluntariness Affected By Physical And Mental Condition
The defendant argues that the police coercively questioned him repeatedly over a day and a half and, in effect, wore down his resistance. On the contrary, we find nothing to suggest that the duration of the various interviews police had with the defendant, without more, rendered the defendant's statements involuntary. The record supports the finding that all of the interrogation sessions were of short duration and did not last the entirety of the "day and a half" as maintained by appellate defense counsel. All of the officers connected with the questioning of the defendant affirmed that the defendant was never threatened, intimidated, or made *138 promises or inducements in order to obtain a statement.
The defendant's encounter with Sgt. Driskell in the early morning hours of December 11, 2001, when the defendant was first arrested and read his rights, lasted mere minutes. Similarly, the defendant's encounter with Sgt. Smith and Sgt. Riviere lasted only a few minutes. The defendant invoked his right to silence and questioning never occurred.
The other instances of questioning were not coercively lengthy. Agent Rupert testified that the entire interview with the defendant later in the morning on December 11, 2001, lasted approximately two hours and the videotaped portion of the interview, including the additional questioning by Chief McGuire and Detective Sonnier, lasted only one hour. The defendant's booking by Lt. Guillory, on the evening of December 11, 2001, lasted less than ½ hour.
On December 12, 2001, the defendant's conversation with Captain Broussard and his unrecorded conversation with Chief McGuire lasted from approximately 7:30 a.m. until 9:19 a.m. The recorded statement obtained from the defendant later that morning lasted from 10:00 a.m. until 10:35 a.m. Based on these numbers, the entire police interrogation of the defendant appears to have consumed less than six hours out of a period of 36 hours. Clearly, the length of time that the defendant was questioned while in custody was not so coercive as to lead to an involuntary statement or confession.
The defendant also complains that the police assaulted him upon his arrest, rendering his subsequent statements to police involuntary. La. R.S. 15:452 provides that no arrestee "shall be subjected to any treatment designed by effect on body or mind to compel a confession of a crime." The record is unclear as to how the slight scratches on the defendant's face and ear occurred. During the videotaped statement of the defendant taken on December 11, 2001, the defendant told Agent Rupert and Lt. Guillory that the police inflicted the scratches during the arrest procedure. To Chief McGuire and Captain Broussard, however, there is an indication that the defendant also stated during his unrecorded conversation with them that the defendant scratched his ear while running through the woods behind the Salone trailer looking for Zimmerman and discarding the gun. We find that however the cut occurred, the mug shot photograph shows only a slight injury and not the result of the police beating a confession out of the defendant. The trial court did not abuse its discretion in failing to find the defendant's statements involuntary on this basis.
The defendant also argues that he was suffering from a head injury, was suicidal and had been suffering from depression and sleep deprivation in the weeks preceding his arrest due to his break-up with Zimmerman, which rendered his confessions involuntary. In support of this argument, appellate defense counsel points to the record of the defendant's custodial statements that claimed that "I just wanna die," "my life is over," "I have nothing to live for," and "I just don't wanna live no more." In addition, counsel relies on the fact of the defendant's self-inflicted head injury after arrest. Finally, the record also shows the defendant complained during some interviews that his head hurt, that he was dizzy, and that he wanted to lie down.
The record also reflects that the police immediately sought medical attention for the defendant after he rammed his head into a wall. The EMT from Acadian Ambulance evaluated the defendant's vital *139 signs and assessed a slight redness to the defendant's forehead but no swelling. When the EMT offered to transport the defendant for medical treatment, the defendant refused.
We find that none of the instances of mental fragility, depression, head injuries or sleep deprivation about which counsel now complains rise to the level of impairing the defendant's ability to voluntarily waive his rights and give a statement to the police. We note that the defendant rested in his cell or slept for most of the time period at issue. That the defendant was depressed during this time period is not in doubt. The defendant had just shot two total strangers in his attempt to capture and abduct his former girlfriend. However, the defendant's sanity was never at issue in this case and there is nothing in the record to suggest that the defendant's statements were not voluntarily given. The trial court did not abuse its discretion in failing to find the defendant's statements involuntary on this basis.
Finally, the defendant argues that the police manipulated his need for medical treatment to secure his statement. During the second part of the December 11, 2001 interrogation, Chief McGuire indicated that she would tell the District Attorney's office about how the defendant felt, i.e. that he thought he needed some medication or to talk to a psychiatrist or something. The following day, just prior to obtaining the recorded statement, Chief McGuire observed that they could get the defendant's statement "on the record" while the defendant waited to see the doctor.
La. R.S. 15:451 prohibits the use of inducements or promises to secure a confession.[74] Counsel's assertions in this argument are utterly contradicted by the record, which is replete with the police's solicitous care of the defendant while in custody. The police immediately contacted medical personnel to evaluate the defendant after his self-injury and he was assured he could see medical or psychiatric professionals if he felt he needed them. The defendant was repeatedly offered food, water, a shower, and the use of the telephone. The defendant's cut ear was attended to by the jail nurse and he was given sleep medication at his request. The police allowed the defendant to take a break outside and a shower before making his recorded confession. The defendant was allowed to sleep and recover in his cell for long periods of time. Viewing the totality of the circumstances surrounding the defendant's custodial statements, nothing presented demonstrates that the statements were anything other than the defendant's voluntary expressions. We find no abuse of the trial court's discretion in failing to suppress the defendant's statements on this basis.

Harmless Error
The defendant argues that the trial court's erroneous admission of his custodial statements and the prosecutor's use of these statements contributed to the jury's guilt and penalty phase verdicts. Specifically, appellate defense counsel argues that the improperly admitted statements were used to establish the defendant's guilt of first degree murder and that the prosecutor used the statements in the penalty phase to characterize the defendant as a remorseless killer who refused to accept responsibility.
*140 As previously discussed, we have found that only the December 11, 2001 statement obtained through interrogation by Lt. Guillory, Agent Rupert, Chief McGuire and Detective Sonnier (discussed herein as the First Statement) was obtained in violation of the defendant's constitutional rights. The admission of this statement into evidence was error. However, "[t]he admission of an involuntary confession is a `trial error,' similar in both degree and kind to the erroneous admission of other types of evidence" which must be reviewed to determine whether the error was harmless. Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991); State v. Harris, 2001-2730 p. 26 (La.1/19/05), 892 So.2d 1238, 1260, cert. denied, ___ U.S. ___, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005); Koon, XXXX-XXXX p. 9, 704 So.2d at 763. "An error is harmless if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error." Koon, XXXX-XXXX p. 9, 704 So.2d at 763.
Reviewing courts must take great care in reviewing whether the admission of a coerced confession constitutes harmless error. In Fulminante, the Supreme Court cautioned:
A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him ... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."
Id., 499 U.S. at 296, 111 S.Ct. at 1257, citing Bruton v. United States, 391 U.S. 123, 139-140, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476 (1968) (White, J. dissenting). After our review of the evidence, we find that this case proves the rule of Fulminante. Not only do we find that introduction into evidence of the defendant's December 11, 2001 interrogation statements was harmless beyond a reasonable doubt, we would go further to hold that the admission of any of the defendant's statements was surely unattributable to either the guilty verdict or the penalty determination. For each stage of this sad sequence of events, the state presented both eyewitnesses and tangible evidence to prove its case beyond a reasonable doubt.
In the guilt phase, the state presented overwhelming evidence that the defendant committed the first degree murder of Troy Salone during the perpetration of an aggravated kidnapping and an aggravated burglary, and that he had the specific intent to kill or inflict great bodily harm upon more than one person. La. R.S. 14:30(A)(1), (3). Zimmerman positively identified the defendant as her ex-boyfriend, and the person who bound her hands with tie-wraps and kidnapped her at gunpoint, driving her to another location in her own van against her will. Likewise, Evelyn Salone positively identified the defendant as the person who shot her in the abdomen at close range, just before he shot her husband inside their trailer home. Zeb LeBlanc made a tentative identification of the defendant as the armed gunman who invaded their home, but his clothing description of the gunman matched precisely the articles of clothing seized from the defendant at the time of his arrest. After the shooting, the defendant led police on a high-speed chase, culminating at the Morgan City Police Department. Officers never lost sight of the blue van in which the defendant attempted his getaway, even though the defendant periodically *141 shut off the vehicle's headlights and drove through fields. Evidence seized from the defendant's home and vehicle, specifically a pregnancy test, tie-wraps and tape, corroborated Zimmerman's account. Additionally, a co-worker of the defendant testified that he sold the defendant a gun just days before the murder.
We find after considering all of the evidence presented by the state at the guilt phase that the guilty verdict rendered by the jury was unattributable to any error with respect to admitting one or more of the defendant's statements. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) ("The inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.") (Emphasis in original).
In the penalty phase of the case, the prosecutor argued to the jury that the statements showed that the defendant refused to take responsibility for his own actions and was remorseless. In State v. Lee, 524 So.2d 1176 (La.1987), where we found evidence of guilt overwhelming but we held that defendant's erroneously admitted statement constituted reversible error in the sentencing phase, we found
[t]here is surely a reasonable probability that this evidence might have contributed to the jury's decision [to impose the death penalty]. Listening to the confession, particularly those portions in which the defendant describes his conduct with apparent indifference, certainly could have led one or more members of the jury to conclude that he felt no remorse for his deeds. A juror listening to the confession also could reasonably be expected to experience strong emotions, ranging from mortification to outrage. Such impressions or emotions could in turn have contributed to the decision of one or more jurors to impose the death penalty.
Lee, 524 So.2d at 1191. This case is distinguishable from Lee.
In many respects, the defendant's statements served as a basis for the jury to mitigate the sentence of death. His videotaped statements showed him crying and upset, indicating a sense of hopelessness and an honest sense of confusion as to why he had committed the actions that he did. His videotaped and audiotaped statements also show regret and remorse. Repeatedly, the defendant expressed his desire to end his life. Even though the jurors rejected the defendant's expressions of remorse as a circumstance to mitigate in his favor and as an argument against the imposition of the death penalty, it cannot be maintained that the statements contributed to the jury's death verdict by depicting him as a conscienceless and remorseless killer. Compare Lee, 524 So.2d at 1191-1193. We find that the death sentence actually rendered in this trial was surely unattributable to any error in admitting any of the defendant's statements and the jury's consideration of them in the penalty phase.
We hold there was no reversible error in connection with any of the defense arguments raised regarding the admission in evidence of any of the defendant's inculpatory custodial statements.

Conflict with Counsel, Self-Representation Assignments of Error 7-9
In these assignments of error, the defendant argues that he repeatedly informed the court during pre-trial proceedings that he was not receiving effective assistance from appointed counsel, Craig Colwart, Chief of the Indigent Defender's Office, and that a conflict of interest existed. The defendant asserts the trial judge *142 failed to protect his right to competent, conflict-free counsel or his alternative right of self-representation.
La. Const. art. 1, § 13 provides in pertinent part that "at each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment." The Sixth Amendment to the United States Constitution likewise carries such a guarantee. In State v. Harper, 381 So.2d 468 (La.1980), this court explained:
As a general proposition a person accused in a criminal trial has the right to counsel of his choice. State v. Leggett, 363 So.2d 434 (La.1978); State v. Mackie, 352 So.2d 1297 (1977); State v. Anthony, 347 So.2d 483 (La.1977). If a defendant is indigent he has the right to court appointed counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Argersinger v. Hamlin, [407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972)]; State v. Adams, 369 So.2d 1327 (La.1979); City of Baton Rouge v. Dees, 363 So.2d 530 (1978). An indigent defendant does not have the right to have a particular attorney appointed to represent him. State v. Rideau, 278 So.2d 100 (La.1973). An indigent's right to choose his counsel only extends so far as to allow the accused to retain the attorney of his choice, if he can manage to do so, but that right is not absolute and cannot be manipulated so as to obstruct orderly procedure in courts and cannot be used to thwart the administration of justice. State v. Jones, 376 So.2d 125 (La.1979); State v. Leggett, supra; State v. Mackie, supra. Id., 381 So.2d at 470-471. The question of withdrawal of counsel largely rests with the discretion of the trial judge, and his ruling will not be disturbed in the absence of a clear showing of an abuse of discretion. State v. Bridgewater, XXXX-XXXX p. 21 (La.1/15/02), 823 So.2d 877, 896, cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003).
The defendant's arguments with regard to this issue of counsel has three parts, those being (1) claim of ineffective assistance; (2) conflict of interest; and (3) self-representation.

Ineffective Assistance Of Counsel and Conflict Of Interest
"Initially we note that ineffective assistance of counsel claims are usually addressed in post-conviction proceedings, rather than on direct appeal." State v. Deruise, XXXX-XXXX p. 35 (La.4/3/01), 802 So.2d 1224, 1247-1248, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001). The post-conviction proceeding allows the trial court to conduct a full evidentiary hearing, if one is warranted. State v. Howard, XXXX-XXXX p. 15 (La.4/23/99), 751 So.2d 783, 802, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999). Where the record, however, contains evidence sufficient to decide the issue, and the issue is raised on appeal by an assignment of error, the issue may be considered in the interest of judicial economy. State v. Smith, XXXX-XXXX (La.6/29/01), 793 So.2d 1199 (Appendix, p. 10), cert. denied, 535 U.S. 937, 122 S.Ct. 1317, 152 L.Ed.2d 226 (2002); State v. Ratcliff, 416 So.2d 528 (La.1982).
Under the standard for ineffective assistance of counsel set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by this court in State v. Washington, 491 So.2d 1337, 1339 (La.1986), a reviewing court must reverse a conviction if the defendant establishes: (1) that counsel's performance fell below an objective standard *143 of reasonableness under prevailing professional norms; and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect.
We find that the record on appeal is sufficient to decide the defendant's claim of ineffective assistance of counsel. The defendant points to various instances in which he informed the court pretrial of deficiencies in appointed counsel's performance, which he claims the court failed to address. The record on appeal contains several motions filed pro se by the defendant. Moreover, since aspects of the ineffective assistance claim overlap with the claim of conflict of interest, we will address these issues together.
First, the defendant points to his October 8, 2002 pleading entitled "Pro Se Motion to Dismiss Present Counsel and Appoint Private Counsel" and an accompanying memorandum of law.[75] The factual allegation of ineffectiveness raised therein concerns appointed counsel's performance at the April 12, 2002 motion hearing. According to the defendant, the prosecutor called to the stand Gary LeGros, an attorney with the public defender's office and the attorney who first visited the defendant in the Franklin Parish jail on December 12, 2001. The defendant believed that attorney LeGros testified that the defendant admitted his crimes to him and was sorrowful, prompting the defendant to ask his counsel, Colwart, to object to this violation of his attorney-client privilege. Instead, the defendant claims that Colwart instructed him to be quiet. In connection with this motion, the defendant also filed a pro se motion seeking the transcript of the April 12, 2002 hearing.[76] On February 3, 2003, the trial court denied the defendant's motion to dismiss counsel.[77]
A review of the transcript from the April 12, 2002 hearing shows that the defendant's memory of events was faulty. In fact, it was defense counsel Colwart who called LeGros to the stand. After eliciting the information that LeGros visited the defendant at the Franklin Parish jail, the following colloquy ensured:
Colwart: . . . And did you  when you advised Mr. Leger of his rights and discussed with him his case, did he indicate to you that he  did ya'll talk about whether he wanted to make a statement or not to the police?
LeGros: We discussed a lot of things. Yeah. And one of the things was that the sta-you know, he wanted to tell his story, and I told him that that's not a good idea.
Colwart: Okay. So you advised him to assert his fifth amendment rights?
LeGros: Absolutely.
Colwart: And he indicated he would?
LeGros: Yes.
Colwart: And did you inform that  did you make known that fact to the Franklin Police Department?
LeGros: I made known that fact to every police officer that I passed on the way out. I told them that I had seen him, he was off limits.[78]
The cross-examination conducted by the prosecutor does not even touch on what LeGros discussed with the defendant.[79] *144 The record, thus, does not support the defendant's belief that the prosecutor, or even defense counsel, elicited or provided a statement to the effect that the defendant admitted to the crimes with which he was charged. The defendant fails to show either that his counsel's performance fell below an objective standard of reasonableness or that counsel's alleged inadequate performance prejudiced him to the extent that his trial was rendered unfair and the verdict suspect. We find no abuse of the trial court's discretion in denying the motion to dismiss counsel on this ground, nor in the trial court's subsequent denial of the defendant's desire to have an independent court reporter re-type the transcript from the original tape recordings of the hearing on the basis of the defendant's belief that the transcript did not accurately reflect the testimony then brought forth.[80]
An instance of the defendant's alleged conflict with counsel was pointed out during a hearing conducted April 1, 2003, when the defendant personally informed the court of the fact that he had filed a complaint against his appointed counsel, Colwart, as well as attorney LeGros and the prosecutors, with the Louisiana Attorney Disciplinary Board.[81] Although not discussed, it is presumed that the complaint was based on the defendant's belief that his attorney/client privilege had been violated, as previously discussed. The defendant presented the trial court with a letter he received from Charles Plattsmier, Chief Disciplinary Counsel. This letter was made a part of this record.[82] After reviewing the letter, the trial court advised the defendant, as follows:
... The document that you handed to me, one of them is dated September 23rd, 2002, and it is a reply from the Chief Disciplinary Counsel, Mr. Charles B. Plattsmier, that the disciplinary counsel does not have the authority to adjudicate the Writ of Habeas corpus, nor petition for Post-Conviction Relief, and the issue of ineffective assistance of counsel is best resolved in a court of law. And on this basis  My understanding of the gist of this letter is that they have rejected your complaint. There's a following letter that you submitted to me, dated November 4th, 2002, addressed to the Louisiana Attorney Disciplinary Board, under the signature of Charles B. Plattsmier, Chief Disciplinary Counsel, wherein you may have requested information concerning Mr. Colwart and Mr. LeGros, and that information was provided to you;[83] additionally, indicating whether or not they were eligible to practice law under the licensure of the Louisiana Supreme Court. And except for the information provided, there is an indication that they are currently attorneys in good standing with the Louisiana State Bar Association and able and permitted to practice law throughout the State of Louisiana and in the Courts of the State of Louisiana. . . .[84]
*145 After considering the defendant's complaint filed against his attorney and his claims of conflict based on that filing, the trial court ruled: "I find that you have not presented anything to me, currently, at this proceeding which would indicate a need to dismiss your attorneys and appoint any other attorneys to represent you."[85]
We find no abuse in the trial court's discretion in failing to remove appointed counsel Colwart based on this claim of conflict of interest. In effect, there was no conflict of interest because the state bar disciplinary counsel had refused to accept the defendant's complaint, since it dealt with a claim of ineffective assistance of counsel. We have previously determined that the basis of the defendant's claim was his faulty memory of what occurred at the April 12, 2002 motion hearing. Thus, the trial court properly found the defendant failed to demonstrate a need requiring Colwart's dismissal.
Also in connection with the April 1, 2003 hearing, attorney Colwart announced that the defense was not ready for trial, then scheduled for May 14, 2003, because the defendant was seeking new counsel.[86] The trial judge responded:
What new counsel? Well, the defendant has Counsel and he has not given the Court any indication why present Counsel should be removed. So as far as the Court is concerned, the defendant has adequate and effective Counsel and the case is ready for trial.[87]
Although this instance is raised as an example of Colwart's ineffective assistance of counsel, the defendant fails to show either that his counsel's performance fell below an objective standard of reasonableness or that counsel's alleged inadequate performance prejudiced him to the extent that his trial was rendered unfair and the verdict suspect. This portion of the trial does not support a claim for ineffective assistance of counsel.
Next, the defendant claims counsel was ineffective in failing to object to the admission of the recorded telephone conversation between the defendant and his brother, Mark Leger. This claimed error was the subject of yet another pro se motion, entitled "Motion and Order to Dismiss Public Defender Craig Colwart and Appoint New Counsel," filed in the court record on June 9, 2003, with a cover letter of June 4, 2003.[88] Prior to the filing of this motion, the trial court had denied the defense motion to suppress all of the defendant's various statements on April 17, 2003.[89] The trial court denied the defendant's motion to dismiss Colwart on this ground without a hearing on July 11, 2003.[90]
The focus of this claim by the defendant is his contention that Lt. Guillory lied during the suppression hearing when he testified that he told the defendant and his brother that their telephone conversation would be recorded. He argued in support of this claim that the tape recording of the conversation shows that no such advice was given. The defendant claimed Colwart was ineffective for failing to argue this ground as part of his motion to suppress.
We have previously reviewed both Lt. Guillory's suppression hearing and trial testimonies, and the recording of the telephone *146 conversation. Although Lt. Guillory may have been mistaken in believing he had told the defendant and his brother that the line was recorded, the audio recording affirmatively shows that Mark Leger was informed that his conversation with the defendant would be on speaker phone, unmistakably implying that the conversation would be overheard by others. Moreover, we found the police's conduct in tape recording the telephone conversation to be consistent with the Supreme Court's holding in Mauro, supra. Thus, there was no legal basis for defense counsel to contest the admissibility of the recorded telephone conversation. The fact that the trial court denied the defense's motion to suppress does not establish ineffective assistance on counsel's part. The defendant fails to show either that his counsel's performance fell below an objective standard of reasonableness or that counsel's alleged inadequate performance prejudiced him to the extent that his trial was rendered unfair and the verdict suspect. There was no abuse of the trial court's discretion in denying the defendant's motion to dismiss Colwart on this basis.
The July 11, 2003 hearing reveals a factual matter important to our discussion regarding assistance of counsel. One of the purposes for the hearing was to discuss the defendant's contact with one of the victims, Kimberly Zimmerman. In a hand-written letter dated June 12, 2003, the defendant wrote a letter to Zimmerman, urging her not to testify against him. The defendant included this statement in his letter "I hope you understand that I have two very good attorneys now that's going to win my freedom easily."[91] (Emphasis added). This letter was penned only eight days after the motion seeking to dismiss Colwart discussed above and a month before the hearing on the matter. Thus, the trial judge was made aware of the defendant's inconsistent assertions regarding the effectiveness of his counsel.
Next, the defendant complains that Colwart did not review an audiotape with the defendant that Colwart claimed in court that he had. This claim resulted in a letter written by the defendant to Colwart and included in the record. In the letter, the defendant asserts that Colwart never reviewed with him the December 11, 2001 interrogation involving Agent Rupert, Lt. Guillory and Captain Broussard.[92]
First, we note there is no audio or video recording of an interrogation occurring on December 11, 2001 which involved all three of the officers listed in the defendant's letter. However, on December 11, 2001, there was an interrogation in which Lt. Guillory and Agent Rupert were involved; and on December 12, 2001, there was an interrogation in which Lt. Guillory, Captain Broussard and Chief McGuire were involved.
Our review of the transcript of the status conference held September 30, 2003, when Colwart allegedly made the statement which the defendant contests, reveals that the defendant is again mistaken in his recollection of the record. Attorney Colwart acknowledged to the court that the state had turned over all the audio and videotapes within the state's possession and that he had "been over about half of them with the defendant."[93] Colwart claimed that, since the defendant's transport to Angola from the parish jail, he had been unable to review the rest of the tapes with the defendant. However, he also stated: "But I do recall, specifically, the *147 Gus Guillory tape that we have, I've been over with the defendant."[94] There is no indication whether Colwart meant the December 11, 2001 interrogation in which Lt. Guillory participated with Agent Rupert or the December 11, 2001 booking statement, or even the December 12, 2001 interrogation in which Lt. Guillory participated with Chief McGuire and Captain Broussard.
Moreover, we fail to discern, because it is not argued precisely, what is being claimed as ineffective assistance of counsel. Insofar as appellate defense counsel finds ineffective that Colwart had not yet reviewed the tapes with the defendant when there were more than three months prior to trial, we find that the defendant fails to show either that his counsel's performance fell below an objective standard of reasonableness or that counsel's alleged inadequate performance prejudiced him to the extent that his trial was rendered unfair and the verdict suspect. Insofar as appellate defense counsel alleges that Colwart was less than honest on the record with regard to his contact with the defendant, we find that the record does not factually support such an allegation.
Finally, on December 10, 2003, defendant addressed the court with his complaints that counsel waited until 15 days before trial before preparing a defense; had failed to file the motions necessary to protect his rights; had refused to accept the defendant's telephone calls or respond to his letters; and had never met with him while he was incarcerated in Angola, although the defendant admitted that counsel visited him about six times at the jail in New Iberia, during which time they were in "total disagreement."[95]
The record shows that after allowing the defendant to speak about the above-described items, the trial judge reviewed all of the pending pro se motions filed by the defendant and denied them as duplicitous of defense motions already filed and heard.[96] The oral motion to dismiss or terminate Colwart as the defendant's attorney, was denied, as well.[97]
Nothing presented by the defendant demonstrates counsel's incompetence, unpreparedness or a bona fide conflict of interest. The trial judge's assessment was correct in that none of the specific instances of claimed ineffective assistance of counsel demonstrated professional error nor merited the trial court's removal of Colwart. We find no abuse of the trial court's discretion in denying the defendant's piecemeal pro se complaints about his counsel's preparation for trial.

Self-Representation
Appellate defense counsel asserts that the trial judge improperly denied the defendant a meaningful opportunity to exercise his right to represent himself at trial, possibly with stand-by counsel. Counsel argues the trial judge erroneously applied the standard to determine the defendant's capacity to act at trial, rather than his ability to waive counsel.
An accused has the right to chose between the right to counsel, guaranteed in the state and federal constitutions, and the right to self-representation. Bridgewater, XXXX-XXXX p. 17, 823 So.2d at 894. However, the choice to represent oneself "must be clear and unequivocal." Id. "Requests which vacillate between self-representation and representation by counsel are equivocal." Id. Whether a defendant has knowingly, intelligently, and *148 unequivocally asserted the right to self-representation must be determined on a case-by-case basis, considering the facts and circumstances of each. Id.
The record shows that the self-representation of the defendant was first raised by the defense at the December 10, 2003 hearing, less than a month before trial.[98] After discussing the defendant's pro se motions which duplicated defense motions already acted upon, defense counsel Colwart indicated the defendant had more that he wanted to discuss at the hearing:
Colwart: Your Honor, earlier this afternoon, Ms. Broussard [defense co-counsel] and myself had talked to Mr. Leger about his motions that you just denied, and the subject matter came up about him possibly representing himself.
I just want to put it on the record right now, because he expressed an interest of a possibility of him representing himself.
And I just want to clarify, on the record, if  does he want to do that, and if so, you need to take the proper steps in determining whether he can be allowed to represent himself or not.
Court: All right. So, you 
Mr. Leger: Your Honor, between choosing bad counsel and representing myself, I would have no choice other but to represent myself.
Because Mr. Colwart has failed numerous times to file motions to protect my rights. This is the reason why I've had to file these motions on my own.
And being a layman in court proceedings, a lack of knowledge of applying the proper court procedures and articles, and therefore that's the reasons and causes why I have brought these motions to the Court's attention.
And they were denied based upon the defendant didn't allow the counsel to file them. And that was one of my arguments in one of the motions I had.
And, Mr. Colwart has waited until 15 days before trial to start preparing a defense, and I believe it's been  it prejudiced  its been prejudiced me; the time has been two years tomorrow since this occurrence have, and now, he chooses to put forth an effort to defend me.
At no time has he came and seen me since I've been housed at the Department of Corrections at Angola. Not once. And maybe a half a dozen times he visited me in New Iberia, but very briefly.
And, in the time we spoke on certain things, we have a total conflict of interest between me and Mr. Colwart. We're not on the same page.

*149 In the little time I've talked with Ms. Broussard, I've only met her one time for 45 minutes, and it seems that we have a better communication between the both of us, and state law says that the defense lawyers must work with the defendant and give notice.
And Mr. Colwart has failed to do that. I can't even make a collect phone call to his office because they won't accept it.
I wrote letters. He hasn't replied back. I had done that with Mr. Gary LeGros, too, and they failed to do that, as well.
So that's why I have filed the motions, Your Honor, on two separate occasions asking for Mr. Craig to be dismissed and appoint another counsel.
Court: All right. But that doesn't speak to  most of what you said doesn't speak to the desire to represent yourself. It still speaks to the desire to be represented by other counsel. Is that what you're telling me?
Mr. Leger: Well, Your Honor, I would like to participate in trial if it's allowed, but 
Court: Well, I  I mean, just over the course of the last ten or fifteen minutes that we've been in court, I have witnessed your participation with counsel and instructing your counsel as to what you would have them to present with respect to motions in court.
There's nothing that I can see that your counsel have done, nor this Court has done to prevent you from participating in your defense.
When it comes to representing yourself in these proceedings, your last comment was that you are not a person trained in the law. You're a layperson and it appears to me that you were pointing up your inadequacy to represent yourself in these proceedings.
So, more and more I'm hearing, or what you just told me, is not what I sense Mr. Colwart was pointing out.
There's not a desire on your part to represent yourself without  in front of the jury or present your case. The question is, you want someone else other than Mr. Colwart. Is that  am I saying it right?
Mr. Leger: Yes, Your Honor. You're saying it right. With me choosing between bad counsel, in which he has demonstrated that.
Today, out of the past two years, Your Honor, is the only time he's done anything where he's talked to me. We've been arguing for the past two years, and we've been bumping heads. And, like I've said, we haven't been on the same page.
I would feel more comfortable if Ms. Broussard would be lead counsel and I would ask the court to 
Colwart: That's something we could probably work out.
Broussard: I'm not certified to be lead counsel.
Court: No. Mr. Colwart. Mr. Colwart.
You brought up the issue of Mr. Leger wanting to represent himself. I don't think that's what he intended.
Colwart: One of the specific things he requested, Your Honor, was to be allowed to question the jurors and the witnesses himself. And I told him that wouldn't be allowed unless he was counsel  unless he was representing himself.
Court: Right. He cannot question witnesses.

*150 Colwart: That's what he means by being allowed to participate in the trial. He want to question certain  not all, I believe, but some of the witnesses that are going to be presented.
Court: No, he  I will direct him to either verbally give the question to his counsel or write it down and actively participate in that sense, but he's not trained, or presented to this Court any indication of skill and understanding with respect to presenting, or questioning, or examining, any witnesses or presenting argument in connection with his defense in this case.
So the motion to represent himself is denied. The motion to participate with counsel in the examination of witnesses or to present argument is denied, if that was the request.[99]
The record shows that the defendant did not make a "clear and unequivocal" assertion of his right to self-represent, rather, his request was "an obfuscated request to substitute appointed counsel because of his disagreement with current counsel's choice of trial strategy." Bridgewater, XXXX-XXXX p. 19, 823 So.2d at 895. In Bridgewater, this court quoted from a federal court addressing a similar request:
A trial court must be permitted to distinguish between a manipulative effort to present particular arguments and a sincere desire to dispense with the benefits of counsel. The circumstances surrounding [the defendant's] purported waiver of his right to counsel and the assertion of his right to proceed without counsel in this case suggest more a manipulation of the system than an unequivocal desire to invoke his right of self-representation. Taking the record as a whole, we are satisfied that the district court was justified, when confronted with [the defendant's] vacillation between his request for substitute counsel and his request for self-representation, in insisting that [the defendant] proceed with appointed counsel.
Id., XXXX-XXXX p. 19, 823 So.2d at 895, quoting United States v. Frazier-El, 204 F.3d 553 (4th Cir.), cert. denied, 531 U.S. 994, 121 S.Ct. 487, 148 L.Ed.2d 459 (2000). Here, too, based on this record, we find that the defendant's request for self-representation was an attempt to manipulate the court system, rather than a sincere desire to dispense with counsel.
Viewing this exchange as another request to obtain counsel other than Colwart, we find no abuse of discretion in the trial court's denial of the motion. This court has consistently held that a defendant's right to counsel of his choice "cannot be manipulated to obstruct the orderly procedure of the courts or to interfere with the fair administration of justice." Bridgewater, XXXX-XXXX p. 20, 823 So.2d at 896. One month short of trial, the trial court clearly had no intention of delaying trial further to accommodate that request. Moreover, there was no justifiable basis for the motion.
Insofar as the defendant's request may be interpreted as a request to participate in his trial in some sort of "hybrid" manner as co-counsel, we find no abuse of the trial court's discretion in denying that request. This court has held that, "`[w]hile an indigent defendant has a right to counsel as well as the opposite right to represent himself, he has no constitutional right to be both represented and representative.'" State v. Brown, XXXX-XXXX p. 29 (La.4/12/05), 907 So.2d 1, 22, quoting State v. Bodley, 394 So.2d 584, 593 (La.1981). Even so, we find that the defendant was intimately involved in the *151 pre-trial and trial aspects of his case. Not only did the defendant file and argue pre-trial motions,[100] and obtain transcripts of all pre-trial hearings on motions,[101] we find that he did participate in significant ways in the defense which was presented at trial. The record shows that the defendant was informed about and selected the defense which was presented,[102] including his decision not to present argument regarding the responsive verdict of manslaughter.[103]
We find no error in the trial court's determinations regarding the defendant's representation, as raised in these assignments of error.

Suppression of Evidence

Assignments of Error 23-24
The defendant argues that the trial court erred in failing to suppress photographic identifications of him made by Evelyn Salone and Zeb LeBlanc.[104] The defendant contends that he sustained cuts to his face and ear during arrest which appear in the photographic array shown to these two witnesses. The defendant urges that, of the six-person line-up, he is the only one with such facial injuries. Consequently, the defendant argues that the photo array shown to these two witnesses was unduly suggestive, tainting the identifications of these two witnesses.

Motion to Suppress Identification
In State v. Higgins, XXXX-XXXX (La.4/1/05), 898 So.2d 1219, cert. denied, ___ U.S. ___, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005), this court held:
as a general matter, the defendant has the burden of proof on a motion to suppress an out-of-court identification. La. Code Crim. Proc. art. 703(D). To suppress an identification, a defendant must first prove that the identification procedure was suggestive. . . . An identification procedure is suggestive if, during the procedure, the witness's attention is unduly focused on the defendant. . . . However, even when suggestiveness of the identification process is proven by the defendant or presumed by the court, the defendant must also show that there was a substantial likelihood of misidentification as a result of the identification procedure.
Id., XXXX-XXXX p. 19, 898 So.2d at 1232-1233.
In Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977), the Supreme Court held that despite the existence of a suggestive pre-trial identification, an identification may be permissible if there does not exist a "very substantial likelihood of irreparable misidentification." Under Manson, the factors which courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include: 1) the witness' opportunity to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Manson, 432 U.S. at 114-15, 97 S.Ct. at 2254.
*152 At trial, Detective Lirette testified how he compiled the photographic array which was ultimately shown to the witnesses, using men with common traits of race, hair, age, facial hair, weight and overall expression with the defendant's mug shot.[105] Detective Rivere obtained that photographic array and presented it to Evelyn Salone at the hospital on December 12, 2001, the day after she had been shot. The officer did not suggest to her which picture she should select. Detective Rivere also showed the same photo array later that same day to Zeb LeBlanc. The detective did not suggest in any way which picture Zeb should select.[106]
Evelyn Salone testified at both the suppression hearing and at trial, stating that she positively identified the defendant in the photo line-up.[107] She testified she had never seen the defendant before the night he shot her and her husband. However, she could see him as they both stood outside her trailer by the light of the streetlight in front of her home, as well as the lighted Christmas decorations on their home. She testified that she was able to get a good look at the defendant's face. Evelyn gave a description of the man who shot her and her husband from the moment the EMTs arrived in her yard. She viewed the photo array one day after the shooting and displayed a high degree of certainty. On the back of the defendant's photo, Evelyn Salone wrote "This is the one who shot me and Troy" above her signature.[108]
Zeb LeBlanc testified at the suppression hearing that he watched the defendant walking back and forth outside the trailer under a tree after he heard gunshots on the night of December 10-11, 2001. After he saw the inert body of his stepfather in the trailer and ran outside to be with his mother, Zeb was confronted by the defendant, who demanded to know where "she" was. The next day at the hospital, the photo array was shown to him. Zeb was not positive that the photograph of the defendant was of the man he had seen, but wrote on the back of the picture "[t]his looks like him but I'm not positive. I remember a yellow jacket and probably a white baseball cap. He was maybe ten feet away. I was bending over with my mom."[109]
At trial, Zeb again testified that he saw a man walking outside the trailer after the shooting. He stated the man "looked sort of puzzled like he was looking for something. He looked a little aggravated."[110] Zeb testified that he got a good look at the man's clothing at that time but was unable to get a good look at the man's face because he was underneath the tree.[111] After he relocated to his mother's side, Zeb was able to get a good look at the man's face. As Zeb stood up after crouching by his mother's side, the man who had been walking underneath the tree stood in front of Zeb and asked him "where is she, where is she?" At that time, the man was about six to eight feet from Zeb, standing face to face.[112]
*153 Analyzing the witnesses' testimony under the Manson v. Brathwaite factors, we find that both eye-witnesses had excellent opportunities to view the defendant. The street light at the end of the driveway and the Christmas lights on the residence itself provided light for them to see the defendant. Both Evelyn and Zeb were standing face-to-face with the defendant at some point. Considering that the defendant kept yelling at both of the family members, their degree of attention was high as they tried to ascertain what the defendant wanted. Both witnesses' descriptions of the defendant were accurate. In fact, Evelyn testified that she told everyone what the defendant looked like from the time emergency medical personnel arrived because feared that she would die. Evelyn was positive in her identification of the defendant. Zeb was not positive as to the defendant's mug shot photograph, but was positive about the clothes the man had been wearing and his identification of the defendant in person. Both Evelyn and Zeb made an independent in-court identification of the defendant at trial.[113]
During trial cross examination, defense counsel asked Detective Lirette, as well as Evelyn Salone and Zeb LeBlanc, whether they noticed that the only person in the six-person photographic array who had cuts on his face was the defendant. None of the three witnesses indicated that he or she had noticed any cuts on the face of the defendant.[114] Apparently, the distinction had minor, if any impact, on the eye-witnesses. Our review of the photographic array shows that the cuts are, indeed, minor and not such as would be unduly suggestive. Clearly, the cuts did not focus any undue attention on the defendant.
Even assuming the line-up was suggestive, however, the defendant fails to demonstrate that Evelyn or Zeb misidentified him. Evelyn Salone was unwavering in her positive identification of the defendant; Zeb LeBlanc was tentative, but correct on the characteristics he remembered. Based on the totality of the circumstances, we find no substantial likelihood of misidentification. The trial court did not err in denying the motion to suppress the identification.[115]

Motion to Suppress Evidence
The defendant claims the trial court erred in failing to grant his pro se motion to suppress evidence. Specifically, the defendant contends that the police did not comply with the strictures of the warrant requirement of the Fourth Amendment with respect to the jacket they seized from him upon arrest and to a pair of gloves taken from his truck parked outside his residence.
The record shows that, immediately after the defendant's arrest, the police filled out an affidavit for a search warrant for his residence and his vehicle,[116] as well as a separate affidavit for a search warrant for the "clothing and property of Donald Leger, Jr."[117] The affidavit supporting the warrant seeking the defendant's clothes described the requested clothing as "a white t-shirt type shirt, white insulated shirt and a yellow wind breaker, jeans and boots."[118] It was noted that the "yellow wind breaker, white t-shirt, white insulated shirt were taken at the time of his booking." The affidavit noted that the jeans *154 and boots were placed in a property locker at the Franklin Police Department.[119]
The search warrant which was issued authorizing the search of the defendant's residence and any vehicles on the property identified the following items which the police were authorized to seize as: "weapons, ammunition, receipts for ammunition and weapons, documents on weapons, evidence of a pregnant {sic} test kit, and tape."[120] The search warrant which was issued to search for the defendant's clothing authorized a search of "The Franklin Police Dept. Locker 2a."[121] In addition, the defendant signed a consent to search form on the morning of December 12, 2001, authorizing the Franklin Police Department to search his home and truck.
The yellow windbreaker jacket was removed from the defendant at the St. Mary's Parish jail, not the Franklin Police Department's jail. Thus, the jacket was in a different location than the one authorized by the warrant for the seizure of the defendant's boots and jeans. However, the seizure of the defendant's jacket at the St. Mary's Parish jail, and the police's retrieval of that jacket without a warrant, was valid. The trial court denied the defense's motions to suppress evidence after a hearing.[122]
A search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions. Taylor, XXXX-XXXX p. 5, 838 So.2d at 738. In State v. Wilson, 467 So.2d 503, 517 (La.1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985), this court held "the right of the police to conduct a personal effects inventory search at the time of an arrested person's booking is a recognized exception to the search warrant requirement." This right to seize items after lawful arrest and during booking is not completely unfettered, as the item seized must be contraband, an instrumentality of the crime, a fruit of the crime, or evidence of a crime. Wilson, 467 So.2d at 517. "In order for the seizure of defendant's clothing under these circumstances to be upheld, the state must affirmatively show the existence of probable cause that the thing seized is somehow related to a particular crime." Id.
At the time the yellow jacket was taken from the defendant, the police had descriptions of the perpetrator of the shooting and murder of Troy Salone and the shooting and injuring of Evelyn Salone from the eyewitnesses, Evelyn Salone and Zeb Le-Blanc. This description included the information that the perpetrator had been wearing a yellow windbreaker-type jacket. The police's conclusion that the yellow jacket would eventually aid in the identification of the defendant as the perpetrator of the crime was reasonable. The defendant's jacket potentially constituted evidence of his involvement in the murder. Here, as in Wilson, "the state had probable cause to seize the clothing as evidence of criminal activity, and the police seizure and retention of such evidence without warrant was lawful." Id., 467 So.2d at 517.
The gloves at issue were seized from the back of the defendant's truck during the officers' execution of the search warrant of the defendant's residence and vehicle. The possible significance of the gloves to this case was explained by Zimmerman, who testified both at the suppression hearing *155 and at trial that, immediately prior to removing her from his house and placing her in her van, the defendant grabbed the gun and some gloves, stating "I can't go back to prison."[123] The officer who seized the gloves explained that he knew the perpetrator may have used gloves during this crime, so he took the gloves from the rear of the truck "as a sample."[124]
Under the plain view doctrine, if police are lawfully in a position from which they view an object that has an incriminating nature that is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. Horton v. California, 496 U.S. 128, 136-137, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990). The fact that the gloves were not listed as items on the search warrant does not invalidate the officer's seizure when the possible criminal significance of the gloves was apparent to the searching officer.
The trial court properly denied the motion to suppress the yellow jacket seized from the defendant at booking and the gloves seized from the back of the defendant's truck during execution of a search warrant.

Cause Challenges of Prospective Jurors

Assignments of Error 17-19
The defendant asserts in these assignments of error that the trial court's voir dire rulings regarding six prospective jurors deprived him of his constitutional rights to full and complete voir dire, to due process, and to reliable and proportionate sentencing in this capital case. Specifically, the defendant complains that the trial judge erroneously denied cause challenges on three prospective jurors raised by the defense and erroneously granted state cause challenges on three other prospective jurors.
La. Const. art. 1, § 17 guarantees that "[t]he accused shall have the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of challenges shall be fixed by law." La.C.Cr.P. art. 799 provides the defendant in a capital case with twelve peremptory challenges. "Therefore, when a defendant uses all of his peremptory challenges, a trial court's erroneous ruling depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence." State v. Cross, XXXX-XXXX p. 7 (La.6/30/95), 658 So.2d 683, 686.
Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant ultimately exhausts his peremptory challenges. State v. Robertson, 1992-2600 p. 3 (La.1/14/94), 630 So.2d 1278, 1280; State v. Ross, 623 So.2d 643, 644 (La.1993). To prove there has been reversible error warranting reversal of a conviction, a capital defendant is only required to show: (1) the erroneous denial of a challenge for cause; and (2) the use of all of his peremptory challenges. Robertson, 1992-260 p. 3, 630 So.2d at 1281. In reviewing the cause challenges, we note that a trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. Cross, XXXX-XXXX at p. 7, 658 So.2d at 686; Robertson, 1992-2660 at p. 4, 630 So.2d at 1281. In the instant case, it is undisputed that the defendant exhausted his peremptory challenges. Therefore, *156 under state law, the defendant need only show that the trial court abused its discretion by denying a defense challenge for cause.
The grounds for which a juror may be challenged for cause by the defendant are set forth in La.C.Cr.P. art. 797, which sets forth in pertinent part:
Art. 797. Challenge for cause
The state or the defendant may challenge a juror for cause on the ground that:
* * *
(2) The juror is not impartial, whatever the cause of his impartiality. . . .
* * *
(4) The juror will not accept the law as given to him by the court . . .
The defendant asserts that two of the prospective jurors should have been excused for cause on the basis of their views regarding capital punishment and one of the prospective jurors should have been excused for his inability to afford the defendant the presumption of innocence. The defendant also asserts that three prospective jurors should not have been excused for cause because their responses to voir dire questioning showed that they could serve as impartial jurors under the law.
The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); State v. Manning, XXXX-XXXX p. 38 (La.10/19/04), 885 So.2d 1044, 1082, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005). Witt clarified the earlier Supreme Court pronouncement in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), that a prospective juror who would vote automatically for a life sentence was properly excluded by the trial court. La. C.Cr.P. art. 798(2)(a) and (b) incorporate the standard of Witherspoon, as clarified by Witt, and provide:
It is good cause for challenge on the part of the state, but not on the part of the defendant, that
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:
(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; . . .
In a "reverse-Witherspoon" situation, the basis of the exclusion is that a prospective juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him ...". Robertson, 1992-2660 p. 8, 630 So.2d at 1284. The "substantial impairment" standard applies equally to "reverse-Witherspoon" challenges. Manning, XXXX-XXXX p. 38 n. 22, 885 So.2d at 1083 n. 22. Thus, if a potential juror's views on the death penalty are such that they would prevent or substantially impair the performance of his duties in accordance with his instructions or oaths, whether those views are for or against the death penalty, he should be excused for cause.
*157 The record shows that the trial court conducted a "pre-qualification" of the jury venire with regard to three issues-hardship, knowledge of the case or parties, and views on the death penalty.[125] If no cause challenge was raised to the prospective jurors after this questioning, they were then further questioned as to general concepts, such as the presumption of innocence.

Stephan Domangue
This prospective juror was questioned in the sixth pre-qualification panel.[126] Stephan Domangue had no knowledge of the case and no hardship which would prevent him from serving on the jury.[127] The prosecutor engaged in the following colloquy with Mr. Domangue to ascertain his views on the death penalty:
Prosecutor: . . . Do you think it's the proper function that the State should have a death penalty for certain types of cases?
Mr. Domangue: Yes, sir.
Prosecutor: Do you have a problem with the State seeking a death penalty in this type of case?
Mr. Domangue: No, I do not.
Prosecutor: Do you understand the procedure now that we have talked about it?[128]
Mr. Domangue: Yes.
Prosecutor: Given that procedure if you are placed on the jury, could you be fair and impartial to both sides?
Mr. Domangue: Now that I understand the procedures, yes.
Prosecutor: Can you would [you] weigh all the factors and be fair? You understand it's not automatic one way or another? That the circumstances determine the appropriate sentence?
Mr. Domangue: Yes, sir.
Prosecutor: You could do that?
Mr. Domangue: Yes, sir.[129]
Defense counsel later questioned Mr. Domangue regarding his death penalty views and referenced some of his answers on the jury questionnaires which were completed by the prospective jurors prior to trial:
Defense counsel: . . . Everybody is entitled to their opinion on this. You favor  "Given them what they deserve." You also put something about  they asked you a question about the defense attorney, what do you think about the defense attorney. And you put, "Why do they need them? If arrested, he must be guilty." Okay, is that how you feel if he's arrested?
Mr. Domangue: Well, I feel if he's caught with his hand in the cookie jar, he's guilty.
Defense counsel: Okay. And at that point is life an option or the only 
Mr. Domangue: Now that I understand the proceedings, yes, sir.
Defense counsel: Okay. You could still keep an open mind?
Mr. Domangue: Yes, sir.
Defense counsel: Okay. You put down, "Give them what they deserve." You favor the death 
Mr. Domangue: Give them life or death.

*158 Defense counsel: Okay. So you didn't mean when you wrote that down that if he kills, then he must 
Mr. Domangue: Oh, no.
Defense counsel:  he must forfeit his life as well?
Mr. Domangue: No.
Defense counsel: But you, you [are] backing off of that a little bit now?
Mr. Domangue: Yes.
Defense counsel: After you have heard how the procedures are?
Mr. Domangue: Yes, sir.
Defense counsel: So life would be an option as a potential sentence?
Mr. Domangue: Yes, sir.
Defense counsel: Even though you found him guilty of first degree murder, you wouldn't 
Mr. Domangue: Now I understand the proceedings, yes, sir.[130]
After questioning of the panel was completed, the trial court asked the prosecutor and defense counsel for cause challenges as to the individual prospective jurors in the panel. Defense counsel challenged Mr. Domangue, stating, "I know he said he backed off, but the statement of his, his written answer in the questionnaire is clear, `Give them what they deserve. If you are arrested, why do you need a defense attorney? You're guilty.'"[131] The prosecutor responded that Mr. Domangue admitted he had been educated about the process and was, thus, rehabilitated. The trial court agreed with the prosecutor and denied the defense challenge for cause.[132]
Although this portion of the voir dire was focused on the prospective jurors' death penalty views, appellate defense counsel uses Mr. Domangue's responses here to argue that Mr. Domangue would not be able to be an impartial juror, that he would presume guilt from the defendant's arrest and that he would be unable to follow the law concerning the presumption of innocencesubjects which would not be discussed with potential jurors until the general questioning portion of voir dire.[133] It is clear from the context of the quoted material that trial defense counsel focused on Mr. Domangue's questionnaire responses with regard to how they impacted his views on capital punishment and the defense challenge for cause was made on that basis. Nevertheless, we find that Mr. Domangue's voir dire responses reveal his understanding that his earlier written answers to the pre-trial questionnaire were not consistent with the law that should be applied to the trial of this matter. Moreover, Mr. Domangue's responses evidenced his desire to follow the law.
The general rule regarding review of prospective jurors for whom a partiality is alleged states that "a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." State v. Robertson, 1992-2600 p. 4, 630 So.2d at 1281. However, a trial court does not abuse its discretion when it refuses to excuse a prospective juror on *159 the ground that he is not impartial where, after further inquiry or instruction, the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. Id. Here, the record affirmatively shows that Mr. Domangue acknowledged that his earlier responses to the written questionnaires were inconsistent with the law and that he was willing to be rehabilitated through voir dire instruction.
Another of Mr. Domangue's questionnaire responses prompted trial defense counsel to question Mr. Domangue specifically during general voir dire questioning regarding the defendant's right to invoke his Fifth Amendment privilege not to testify:
Defense counsel: ... Mr. Domangue, you stated yes [on the questionnaire]. You do feel that if defendant doesn't testify that he has something to hide. You said, Yes.
Mr. Domangue: Yes.
Defense counsel: Okay. In spite of that feeling  it's okay to have that feeling. What we need to know from you is will that influence you in any way in deciding the case if what the State is proving or not; you can accept the law given to you by the Judge and not let that influence you in any way?
Mr. Domangue: Correct.[134]
The record shows that after successfully challenging another prospective juror from this panel after the general voir dire questioning was completed, defense counsel stated he had no further cause challenges for this panel.[135] Appellate defense counsel did not challenge Mr. Domangue for cause with regard to any general voir dire issues. Instead, trial defense counsel used a peremptory challenge to excuse Mr. Domangue from the venire. Appellate defense counsel raises no issue with regard to this portion of the voir dire that would require our review. The issues raised with regard to this prospective juror have no merit.

Ginny Raymond
The defendant argues that the defense cause challenge lodged against prospective juror, Ginny Raymond, should have been granted because her voir dire responses showed that she would automatically vote for the death penalty if the defendant were found guilty of first-degree murder and an aggravating circumstance existed.
The record shows that Ms. Raymond was questioned in the ninth pre-qualification panel.[136] She initially indicated to the court that she had an upcoming custody hearing in two weeks for which she needed to prepare, but also admitted that the hearing date was subject to change.[137] When questioned by the prosecutor as to her view of the death penalty, the following colloquy occurred:
Prosecutor: Ms. Raymond, do you think it's the proper function that the State should have a death penalty in certain types of cases?
Ms. Raymond: Yes.
Prosecutor: Do you have a problem with the State seeking a death penalty in a first degree murder case?
Ms. Raymond: No.
Prosecutor: Do you understand the procedure that we talked about?[138]

*160 Ms. Raymond: Yes, I do.
Prosecutor: Do you understand that it's not automatic one way or the other?[139]
Ms. Raymond: Right.
Prosecutor: That we do have to present  we do have a burden at the penalty phase?
Ms. Raymond: Uh-huh (Indicating affirmatively.)
Prosecutor: Do you think you could consider a death sentence and a life sentence and make an appropriate determination?
Ms. Raymond: Yes, I think I can.[140]
Trial defense counsel posed a single question only to Ms. Raymond as to her death penalty views:
Defense counsel: And Ms. Raymond, I'll ask you the same question. If they proved beyond a reasonable doubt that my client was guilty of first degree murder and an aggravating circumstance exists, would you automatically vote for the death penalty?
Ms. Raymond: Yes.[141]
After ascertaining that the exact date of Ms. Raymond's impending custody hearing could be determined in order to avoid a conflict with her possible jury service, the prosecutor then questioned Ms. Raymond further in an attempt to rehabilitate her with regard to her view that imposition of the death penalty was in any way automatic upon a finding of first degree murder:
Prosecutor: Okay. Now the second question I have for you, Ms. Raymond, is similar to what we talked about-Mr. Smith and I. You remember the procedures we talked about?
Ms. Raymond: Uh-huh (Indicating affirmatively.)
Prosecutor: And you understand that the State has a burden in both the sentencing phase and the penalty phase?
Ms. Raymond: Right.
Prosecutor: And you understand that even if we prove beyond a reasonable doubt the existence of an aggravating circumstance, there's still no automatic sentence under Louisiana law?
Ms. Raymond: Right.
Prosecutor: You understand that. The jury determines what is the appropriate sentence based on the facts and circumstances.
Ms. Raymond: Yes.
Prosecutor: You understand that procedure?
Ms. Raymond: Yes.

*161 Prosecutor: There's no situation where any sentence is automatic based upon some law provision. It's always up to the jury to determine what the appropriate sentence is. You understand that?
Ms. Raymond: Right. Yes.
Prosecutor: Okay. Given that understanding, could you, even if the State proved beyond a reasonable doubt the existence of an aggravating circumstance, could you consider both a life sentence or a death sentence and base your decision on the appropriateness based on the circumstances in the particular case?
Ms. Raymond: Yes.
Prosecutor: So you could consider both sentences?
Ms. Raymond: Yes. Yes.[142]
The defense challenged Ms. Raymond for cause on the following bases:
Your Honor, we would challenge Ms. Raymond. She has a custody trial coming up on the 28th wherein she is trying to obtain custody of her children, needs to meet with her attorney and prepare for it, as well as answering my question that she would automatically vote for the death penalty.[143]
The court denied the challenge with the following observation:
And on questioning by [the prosecutor] she indicated that she could consider both a death sentence or a life sentence and not necessarily impose the death sentence automatically upon the finding of guilt on first degree murder. The Court will deny the challenge.[144]
There was no abuse of the trial court's discretion in denying the challenge for cause on the basis of the possibility of Ms. Raymond's pending custody hearing. Ms. Raymond's answers to questioning showed that she was not aware of the exact date when the hearing would be held and was unsure whether the hearing would even conflict with the trial. Moreover, she indicated that she would know the date of the hearing, or would have that figured out, prior to the end of the week before the jury would be finally selected.[145]
Nor did the trial court abuse its discretion in denying the cause challenge on the basis of Ms. Raymond's death penalty views. "While the reviewing court must carefully review the record of voir dire for abuses of discretion, it need not and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify either qualification or disqualification." State v. Lucky, 96-1687 p. 7-8 (La.4/13/99), 755 So.2d 845, 851, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000); see State v. Ball, 2000-2277 p. 21 (La.1/25/02), 824 So.2d 1089, 1108, cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002) (prospective juror's use of the term "automatically" was troubling, but more likely merely mirrored the defense counsel's use of the term in the question put to her). This court must look to the entire voir dire on this subject matter and not individual responses. Although Ms. Raymond may have been predisposed in favor of the death penalty, this court has held that "[n]ot every predisposition or leaning in any direction rises to the level of substantial *162 impairment." Lucky, XXXX-XXXX p. 7, 755 So.2d at 850.
Ms. Raymond's initial response to the prosecutor showed that she could consider both a sentence of life imprisonment and the death penalty for first degree murder. Her agreement that the imposition of the death penalty would be "automatic," in response to defense counsel's sole question, is inconsistent with her initial response. Moreover, the prosecutor's detailed subsequent questioning established that Ms. Raymond's views on the death penalty would not prevent or substantially impair her from fulfilling her duties as an impartial juror. "A trial court's refusal to excuse a prospective juror for cause is not an abuse of discretion, even when the juror has voiced an opinion seemingly prejudicial to the defense, if the juror, on further inquiry or instruction, demonstrates a willingness and ability to decide the case impartially according to the law and evidence." Lucky, XXXX-XXXX p. 6, 755 So.2d at 850.
The trial judge is in the best position to determine whether a prospective juror is substantially impaired. This court has previously held "[s]ignificantly, it is in the determination of substantial impairment that the trial judge's broad discretion plays the critical role." Lucky, XXXX-XXXX p. 7, 755 So.2d at 850. We find from our review of the record that there was no abuse of the trial court's discretion in denying the defense cause challenge to Ms. Raymond.

Anthony Parker
The defendant argues that the defense cause challenge lodged against prospective juror, Anthony Parker, should have been granted because his voir dire responses showed that he would automatically vote for the death penalty if the defendant were found guilty of first-degree murder and an aggravating circumstance existed.
Like Ms. Raymond, Mr. Parker was questioned in the ninth pre-qualification panel. Mr. Parker's initial responses to the prosecutor's questions regarding his death penalty views were as follows:
Prosecutor: Do you think it's the proper function for the State of Louisiana to have a death penalty in certain types of cases?
Mr. Parker: Yes.
Prosecutor: Do you have any problem with the State seeking a death penalty in a first degree murder case?
Mr. Parker: No, I don't.
Prosecutor: Do you understand generally now the procedure that Louisiana has set up for the imposition or the potential imposition of the death penalty?
Mr. Parker: Yes, I do.
Prosecutor: Do you believe that you could consider both a life or a death sentence
Mr. Parker: Yes, I can.
Prosecutor:  in a particular case? Now, you indicate on your death penalty question on your form  I think the question that's posed to you on your form is: "Do you generally favor or oppose?" And I think you answered yes, which kinda leaves us bunch of lawyers reading this, we don't really know what you mean. Could you explain your position-let me ask you this question: On a scale from one to ten, ten being the strongest; one being the weakest, what is your position with regards to the death penalty?
Mr. Parker: Ten.[146]
*163 As with Ms. Raymond, trial defense counsel posed only one question to Mr. Parker: " . . . Would you automatically vote for the death penalty?"[147] When Mr. Parker responded, "Yes," trial defense counsel made no further inquiry.[148]
After asking Ms. Raymond further questions, the prosecutor did the same with Mr. Parker:
Prosecutor: Mr. Parker, a similar question to you. You recall the procedures that we talked about?
Mr. Parker: Yes, sir.
Prosecutor: And I believe in your questions to [defense counsel], she indicated to you that if the State would prove an aggravating circumstance, then you would have an automatic outcome. You understand that's not Louisiana law?
Mr. Parker: Yes.
Prosecutor: The State has the burden of proving the existence of at least one aggravating circumstance. You remember we talked about that?
Mr. Parker: Yes.
Prosecutor: And you remember we talked about there's no situation where a sentence is automatic under Louisiana law in this type of case. You understand that?
Mr. Parker: (NO RESPONSE)
Prosecutor: My question to you is, even if the State proves the existence of an aggravating circumstance, could you consider the two possible sentences, a life sentence or a death sentence?
Mr. Parker: Yes, I can.
Prosecutor: So you could consider a life sentence regardless of what's presented at the sentencing hearing?
Mr. Parker: Yes.[149]
Following the completion of this pre-qualification, the defense sought to exercise a cause challenge against Mr. Parker: "Your Honor, we would challenge on the same basis [as Ms. Raymond]. When we questioned him, he said he was a ten in favor of the death penalty and would automatically vote for death."[150] The trial court responded, "I would indicate that he appears to have been successfully rehabilitated by the State and the challenge is denied."[151]
Like Ms. Raymond, Mr. Parker was predisposed in favor of the death penalty. Yet, this court has held that "[n]ot every predisposition or leaning in any direction rises to the level of substantial impairment." Lucky, XXXX-XXXX p. 7, 755 So.2d at 850. After reviewing the totality of Mr. Parker's voir dire responses, we find that he was successfully rehabilitated by the state and understood there was no automatic life sentence or sentence of death upon the affirmative finding of an aggravating circumstance. Thereafter, his views on capital punishment would not prevent or substantially impair his performance as an impartial juror. There was no abuse in the trial court's denial of the defense's cause challenge for this prospective juror.

Elizabeth Pennison
The defendant asserts that the trial court erred in granting the state's cause challenge to prospective juror, Elizabeth Pennison, because her voir dire responses showed she could follow Louisiana law and *164 consider both a life sentence and the death penalty.
The record shows that Ms. Pennison was questioned in the seventh pre-qualification panel.[152] When asked her views on capital punishment, the following colloquy occurred:
Prosecutor: Ms. Pennison, do you think it's the proper function of the State to have a death penalty?
Ms. Pennison: Yes.
Prosecutor: Do you have a problem with the State seeking the death penalty in this particular case?
Ms. Pennison: No.
Prosecutor: And we kind of know a little bit about what you all put [on the questionnaires]. On your questionnaire that you filled out you indicated that you opposed the death penalty. Can you explain that to me?
Ms. Pennison: Okay, I thought you said if the State wants to impose the death penalty. What I mean by that is, I don't like to sentence anyone to death. I don't think I'm God to do that.
Prosecutor: And I understand that's a hard decision.
Ms. Pennison: Yes, it's a hard decision to make and I would rather not make it.
Prosecutor: My question to you is: Could you consider imposing a death sentence in any circumstances? Are there circumstances where you can consider imposing a death penalty?
Ms. Pennison: I would rather see the person go to life in prison than death.
Prosecutor: Is that some believe {sic} you've had for some time?
Ms. Pennison: Uh-huh (Affirmative response)
Prosecutor: Based on your position on this issue, do you feel like you would be in a position to vote automatically for a life sentence because of your views?
Ms. Pennison: Right. I would not vote for death.
Prosecutor: So you can't think of circumstances where you would consider a death sentence?
Ms. Pennison: Uh-uh (Negative response).[153]
When the defense was afforded the opportunity to question the panel, trial defense counsel posed the following questions to Ms. Pennison:
Defense counsel: . . . Ms. Pennison, you indicated that you would rather a life sentence if that option was available to you?
Ms. Pennison: Uh-huh (Affirmative response).
Defense counsel: Okay. And just to step back a few steps, the goal of what we are doing is trying to find twelve impartial and fair jurors. And that means someone who can accept Louisiana law, who can look at all of the evidence and the circumstances, and make a fair and impartial decision in this case. Okay? So just because you rather life doesn't necessarily make you unfair. The question is: Could you follow Louisiana law and consider the death penalty?
Ms. Pennison: Yeah. In that case, yeah.[154]
When the prosecutor asked Ms. Pennison about her inconsistent responses, she responded as follows:

*165 Prosecutor: I have just two brief questions for Ms. Pennison. Ms. Pennison, you indicated to [defense counsel] that you could consider both, but you had indicated to us, even if you did that, you would automatically vote for life. Is that your position?
Ms. Pennison: Is that what I said?
Prosecutor: I believe you indicated in my question to you is that you would automatically vote for a life sentence based upon your position, the way you feel about the death penalty.
Ms. Pennison: I would have to hear all of the evidence before I could actually say.
Prosecutor: Are there any circumstances under which you can consider imposing a death penalty?
Ms. Pennison: Uh-uh (Negative response.)[155]
When the trial court asked counsel for their cause challenges for this panel based on their pre-qualification responses, the state sought to remove Ms. Pennison on the basis that she would automatically vote for a life sentence.[156] The trial court granted the state's challenge, which drew an objection from defense counsel, who argued that when she questioned Ms. Pennison, "she said she could consider the death penalty."[157] The trial court explained its ruling with the following observation:
Yes, when anyone questioned her, she followed their questioning, their line of questioning, which indicates to the Court that she doesn't know where she is and would not be appropriate as a juror in this case.[158]
The record supports the trial court's determination. Upon initial questioning, Ms. Pennison stated that, while she had no objection to the state's role in authorizing the death penalty or its imposition of this sentence, she could not personally sentence anyone to death. When subsequently asked a question by defense counsel which equated her ability to consider a death sentence with her ability to follow the law and be fair, Ms. Pennison then stated that she could consider a death sentence. Upon further questioning by the prosecutor, Ms. Pennison re-affirmed that she could not consider imposing a sentence of death. The totality of her responses shows that Ms. Pennison was not an impartial juror under La.C.Cr.P. art. 798(2)(b) in that her attitude toward the death penalty would prevent or substantially impair her from making an impartial decision as a juror in accordance with her instructions and her oath. There was no abuse of discretion in the trial court's granting of the state's cause challenge as to this prospective juror. Alida Martin
The defendant argues that prospective juror, Alida Martin, stated she would be willing to follow the law and consider imposing both the death penalty and life imprisonment. Thus, the defendant asserts the trial court abused its discretion in granting the state's cause challenge as to this prospective juror.
The record shows that Ms. Martin was questioned in the fifth pre-qualification panel.[159] In response to the prosecutor's questioning regarding her view of capital punishment, Ms. Martin responded as follows:

*166 Prosecutor: Okay, Ms. Martin. I think you may have indicated something similar to [another prospective juror in the panel, who believed that the death penalty was an "easy way out"[160]] in your questionnaire. Is that's accurate, if you recall? I know it's been some time since y'all filled them out.
Ms. Martin: Oh, it definitely has.
Prosecutor: Well, let me just start off by asking you the question: do you think it's the proper function of the State to have a death penalty here in Louisiana?
Ms. Martin: I would say-I don't recall how I answered, but in my right mind now, I would have to answer the question yes.
Prosecutor: Okay. Understanding the procedures, I, but, do you recall, you don't recall how you answered?
Ms. Martin: I don't recall because it's been, I think I got it-the day I got it I answered it. The next day and I send {sic} it off and it's been what? Three months ago, four months ago?
Prosecutor: Okay.
Ms. Martin: But I would say yes, should have the death penalty.
Prosecutor: Okay. Do you think you could impose the death penalty in this type of case or a type of case that we're talking about?
Ms. Martin: I really can't say because who am I to take someone's else {sic} life when they've done wrong. So why should I, I mean, it's almost to the point of taking someone's life would be, that had taken somebody's {sic} else, would be yes, in one way and then in another it would be no.
Prosecutor: Okay.
Ms. Martin: Because I feel as though you, you hurt, you hurt somebody's family and I think you to feel the pain, you need to feel the hurt that you had put upon somebody else.
Prosecutor: So do you kind of lend towards like [the other prospective juror] said you would, want to see them have a hard labor sentence for the rest of their life? I think that's what you indicated in your questionnaire.
Ms. Martin: Yes.
Prosecutor: Okay. So we need to understand and we need to delve into that a little bit more. Are you in a position where you would automatically vote against the imposition of the death sentence and vote for a life sentence given your position?
Ms. Martin: I would say so.
Prosecutor: So you think you would be one to automatically vote for life because you have a problem with the death penalty?
Ms. Martin: Yes.
Prosecutor: Okay. And then the second question that I would like to pose to you about given your attitude toward the death penalty and, you know-we're glad that you're being honest with us, Ms. Martin-would you feel like your attitude toward the death penalty would impair you from being impartial to the State if we're in fact seeking the death penalty?
Ms. Martin: No.
Prosecutor: Okay. That, that-I don't really understand the answer to that question given your answer to the prior question in the sense that you indicated previously that you would probably or you would be the one inclined to automatically vote for a life sentence. Is that right?

*167 Ms. Martin: Yes, that's correct. I feel as though you should suffer.
Prosecutor: Okay.
Ms. Martin: For you, taking someone else's life.
Prosecutor: So you would 
Ms. Martin: Honestly? I think just going, being, maybe we are confusing. Just giving you an injection to die is an easy way out.
Prosecutor: Okay.
Ms. Martin: That's a cop-out. I think you need to sit back and think about what you done over the years and, you know, live yourself in misery.
Prosecutor: So you, again, would be in a position where you'd automatically vote against the imposition of a death penalty, given those beliefs?
Ms. Martin: Right.[161]
When the defense questioned this panel, Ms. Martin responded as follows to the questions posed by trial defense counsel:
Defense counsel: . . . You said that you would automatically vote for a life sentence. I'll ask you the same question I asked [another prospective juror in the panel], are there any circumstances at all that you think you could consider a death sentence?
Ms. Martin: Depending on the situation, what the circumstances are, I probably could. For example, if it was my child or whatever, I'd probably kill that man.
Defense counsel: So you could consider all of the evidence and all of the circumstances and consider it.
Ms. Martin: I probably would if it would interfere with me. But, I mean, it goes back to I think one should be punished for what he's done. And I'm not going to say death is always the circumstance there to show punishment because, just `cause [you] take somebody else [`s] life, I mean what [are] you getting out of it. It's just like they're gone just like your family. I feel as though they need to suffer.
Defense counsel: All right. And what I'm trying to be clear on is, are you saying that you would automatically vote for life or would you take into account all of the circumstances and everything surrounding this particular case and consider whether the penalty should be death or life?
Ms. Martin: (NO RESPONSE)
Defense counsel: I'm not asking you to commit that you would vote for a death penalty. I'm asking you if you could consider a death penalty.
Ms. Martin: Could I consider it. It would-I would have to go back to the answer considering in the evidence.
Defense counsel: Right. So you would consider the evidence and consider the penalty.
Ms. Martin: Evidence-I mean then I could make a decision on it. I mean I can't, I could sit up here right now and I don't really know nothing {sic} about [the] case.
Defense counsel: Right.
Ms. Martin: But I really can't. It's kind of hard to say I want death.
Defense counsel: Right. I mean that would be hard for anybody. I, I think [another prospective juror], you would agree a sentence of death would be difficult, right?
Ms. Martin: My decision would be more to sway to life than death.
Defense counsel: And I understand that. I'm just asking is that an automatic sway or is the death penalty *168 something that you would be willing to consider based on the evidence. And I think you've said you would consider the evidence so that's saying you would consider the penalty.
Ms. Martin: Right.[162]
After being called in individually to ascertain if she had any knowledge of the case which would prevent her from being an impartial juror, Ms. Martin answered further questions from the prosecutor about her death penalty views:
Prosecutor: We had kinda gotten a few different answers from you at one point. And I understand it's difficult to talk about this, but you indicated at one point that a life sentence would be automatic regardless of the evidence because you think it's the easy way out to give the death penalty. Is that you {sic} position?
Ms. Martin: Yes, it is.
Prosecutor: Okay. And then you indicated the only one circumstance where you could consider the death penalty was if somebody killed your child. Is that the only circumstance, I think that's the only circumstance 
Ms. Martin: Well.
Prosecutor:  you came up with.
Ms. Martin: Well, I mean in other situation there'll probably be other reasons that I would consider the death penalty, but I mean, I know specifically I would consider the death penalty if something happen {sic} to one of my children.
Prosecutor: Right. But we need to know the answer to this question clearly; would you consider the imposition of the death penalty in this case under any circumstances?
Ms. Martin: (NO RESPONSE)
Court: Could you rephrase the question in the sense adding under the circumstances of Louisiana law.
Prosecutor: Okay.
Prosecutor: Would you consider, could you consider the imposition of the death penalty in this case based on Louisiana law that you've been talk, that we've been talking about?
Ms. Martin: After [I] heard the evidence, I mean it's possible. Possible that I could depending on once the evidence is issued to me.
Prosecutor: Uh-huh (Indicating affirmatively).
Ms. Martin: I mean, but it's kind of  I hate to say yes right for sure because I haven't heard the evidence.
Prosecutor: Okay. So you're not sure you could even consider the death penalty in this particular case. Is that what you're saying?
Ms. Martin: I mean.
Prosecutor: Given your beliefs about you think it's the easy way out.
Ms. Martin: Honestly, I think it's the easy way out.[163]
The state subsequently challenged Ms. Martin for cause, stating as its reasons:
Judge, the State would challenge for cause. She initially indicated that she thought the death penalty was an easy way out and she would always oppose the death penalty. When asked about what circumstances, under what circumstances she could consider a death sentence, she indicated if her child was taken. And in the last round of questioning she again reiterated that her vote would be automatic for life and that she could not, could not say for sure *169 whether she would even consider a death sentence in this particular case.[164]
The trial court granted the state's cause challenge, which drew an objection from trial defense counsel.[165]
We find no abuse of the trial court's discretion in granting the state's cause challenge. Ms. Martin's responses showed she had much more than a strong leaning in favor of life imprisonment. Her responses revealed that she would not consider a death penalty unless the victim was her child or the killing affected her personally. She did not indicate any other circumstance which would allow her to consider a sentence of death. In addition, she firmly stated her belief that a death sentence was "the easy way out" and implied that a death penalty would not result in sufficient suffering for a guilty defendant. In her last responses, she indicated she would not know if she could even consider a death sentence until she knew the facts and circumstances of the case. Ms. Martin's voir dire responses show that her attitude toward the death penalty would prevent or substantially impair her from making an impartial decision as a juror in accordance with her instructions and her oath. La.C.Cr.P. art. 798(2)(b). Thus, she was properly excused upon the state's cause challenge.[166]
Finally, the defendant argues that the trial court did not apply the law evenhandedly in its rulings on cause challenges by the state and by the defense. The defendant complains that the trial court granted state cause challenges on the ground that the juror appeared to the court to be "equivocal" but denied the defense cause challenges to prospective jurors which the defense claims exhibited the same vacillation in their responses.
Our review of the record fails to reveal disparate treatment on the part of the trial judge in his determination of the parties' cause challenges. Each of his rulings noted supra is supported by the record. In addition, we note the deference afforded to a trial court's first-hand observation of tone of voice, body language, facial expression, eye contact, or juror attention. This court has previously held "[s]ignificantly, it is in the determination of substantial impairment that the trial judge's broad discretion plays the critical role." Lucky, XXXX-XXXX p. 7, 755 So.2d at 850. The record does not support the defendant's argument of disparate treatment.

Sufficiency of the Evidence

Assignments of Error 10-12, 27
The defendant argues in these assignments of error that his first degree murder conviction and death sentence are unreasonable in light of the evidence establishing that he acted in sudden passion and heat of blood. The defendant claims that his despair over the perceived loss of his unborn child induced him to act in a "sudden passion" and/or "heat of blood" which supported a conviction for manslaughter, not first degree murder.
*170 In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984). Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, "assuming every fact to be proved that the evidence tends to prove." La. R.S. 15:438; see State v. Neal, XXXX-XXXX p. 9 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory test of La. R.S. 15:438 "works with the Jackson constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." Neal, XXXX-XXXX p. 9, 796 So.2d at 657.
To convict the defendant of first degree murder, the prosecution was required to prove beyond a reasonable doubt that the defendant specifically intended to kill or to inflict great bodily harm on the victim during the perpetration or attempted perpetration of certain felonies; or that the defendant had the specific intent to kill or inflict great bodily harm upon more than one person. La. R.S. 14:30(A)(1), (3).[167] The state bore the burden to prove these elements, and to prove the identity of the defendant as the perpetrator. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); Neal, XXXX-XXXX p. 10, 796 So.2d at 657. In addition, "[a]s a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification." Neal, XXXX-XXXX p. 11, 796 So.2d at 658; State v. Smith, 430 So.2d 31, 45 (La. 1983). A positive identification by only one witness is sufficient to support a conviction. Neal, XXXX-XXXX p. 11, 796 So.2d at 658; State v. Mussall, 523 So.2d 1305, 1311 (La.1988).
Manslaughter is a homicide which would either be first or second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his cool reflection and self-control. See La.R.S. 14:31(A)(1).[168] "The elements of `sudden *171 passion' and `heat of blood' are mitigatory factors in the nature of a defense, and when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate." State v. Deal, 2000-434 p. 5 (La.11/28/01), 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). In addition, "provocation and time for cooling are questions for the jury to be determined under the standard of the average or ordinary person, one with ordinary self control." Id., see Reporter's Comment to La. R.S. 14:31 and State v. Mayfield, 186 La. 318, 322, 172 So. 171, 172 (1937). "If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act." See Reporter's Comment to La. R.S. 14:31.
The jury was free to infer from the defendant's own words his state of mind as a mitigating factor to lessen his culpability from first degree murder down to manslaughter.[169] Through his statements, the jury learned that the defendant attributed his entire mental state to Zimmerman and their break-up, and then to her pronouncement that she did not wish to have a child with him. The jury also learned of the defendant's strong desire for a wife and a family. Consequently, the defendant's strong reaction to the thought that he would be denied a child he may have conceived could have been viewed as mitigation for his actions.
However, the jurors also heard from Zimmerman that she was not pregnant, that the home pregnancy test confirmed that she was not pregnant and that the defendant was aware of that fact. Zimmerman testified that when the test came back negative, showing she was not pregnant, the defendant's first reaction was to comment "I hope you're happy now."[170] Even after he was faced with the fact that Zimmerman was not pregnant, the defendant expressed concern that she had not performed the pregnancy test correctly and became increasingly irate and aggressive. The fact that Zimmerman was not pregnant or her statement that she did not want to have other children, is insufficient to cause an average person to lose control. In addition, Zimmerman's refusal to have sex with her former boyfriend would also be insufficient to cause an average person to lose control.
Moreover, the jurors were free to reject the defendant's claimed reverence for a family when presented with evidence that the defendant kidnapped the alleged mother of his unborn child, tied her up and gagged her, and told her he would kill her and dump her body and her van in water where no one could find it. Zimmerman's actions in jumping out of the moving van clearly evidenced her belief that her life was in imminent danger. Zimmerman jumped out of a moving car, hit the ground screaming for help and ran away from the defendant to save her life. Evelyn Salone heard her screaming and reacted to the urgency in Zimmerman's voice. Zimmerman's terror is clear in her call to the 911 dispatcher. Steven Andrade, the man who sheltered Zimmerman, in requesting an immediate police presence, told the 911 *172 operator that Zimmerman was "scared to death."
Further eroding the defendant's claim of sudden passion or heat of blood is the fact that he made arrangements to purchase the 9 mm Baretta handgun during a time when he was actively harassing Zimmerman. Ricky Adams, the defendant's co-worker, testified that he brought the gun to work on December 7, 2001 and gave it to the defendant in exchange for $140 cash and a promise to pay an additional $60 later. The record shows that the defendant's actions in the weeks preceding the shooting demonstrate a pattern of menacing behavior and threats directed toward Zimmerman, such that his actions on the night of December 10, 2001 were more a culmination of a slow and steadily increasing anger rather than a sudden passion or heat of blood.
Finally, even assuming that the defendant's claims regarding his "sudden passion or heat of blood" were true, the fact that he brought those emotions to bear on absolute strangers negates the possibility of the usual manslaughter scenario. The defendant did not kill or injure Zimmerman, who allegedly aroused these impetuous passions, but Troy and Evelyn Salone, complete innocents in this tragic chain of events. By his own statements, the defendant admits he believed the Salones were shielding Zimmerman from him. Thus, as barriers to the focus of his ire, the defendant specifically acted to remove what he considered to be the obstacles in his path, i.e. the Salones. Moreover, the shooting of the Salones was separate in time and place from the scene of the provocation, the defendant's conversation with Zimmerman at his residence. Under these circumstances, the jury, viewing the evidence in the light most favorable to the prosecution, rationally found that the defendant had failed to prove the mitigatory factors of sudden passion or heat of blood by a preponderance of the evidence.
Instead, the jury was presented with ample evidence to support their verdict of guilty of first degree murder beyond a reasonable doubt. Evelyn Salone testified that the defendant deliberately pointed the gun directly at her and fired. She testified the defendant then chased her husband, Troy, into the trailer where she heard another shot. Zeb LeBlanc heard the gunshot that killed his stepfather and stepped out of his bedroom to see his stepfather's inert body slumped by the couch. Zeb saw the defendant moments later with the gun in his hand. The jury thus heard evidence sufficient to find beyond a reasonable doubt that the defendant specifically intended to kill or inflict great bodily harm upon more than one person, in violation of La. R.S. 14:30(A)(3). See State v. Broaden, 1999-2124 p. 18 (La.2/21/01), 780 So.2d 349, 362, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001) (pointing and firing a gun at point-blank range supports an inference of specific intent to kill).
In addition, the state presented evidence to convince a reasonable jury beyond a reasonable doubt that the defendant specifically intended to kill or inflict great bodily injury while he was engaged in the perpetration or attempted perpetration of an aggravated kidnapping or second degree kidnapping. See La. R.S. 14:30(A)(1). Aggravated kidnapping is defined in La. R.S. 14:44 as:
the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:

*173 (1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
The defendant contends that a reasonable jury could not have found him guilty of aggravated kidnapping. Counsel argues that, if the defendant's intent in seizing Zimmerman was to kill her, then the facts fail to support the extortion element of the crime. We disagree, as our law does not impose a requirement of ransom communicated to others or even the communication of the extortion requirement to the victim. See State v. Arnold, 548 So.2d 920 (La.1989). As we held in Arnold:
... the crucial question in determining whether an aggravated kidnapping has occurred is not whether the defendant had intent to release the victim at either the outset of the crime or indeed at any point during the crime. The more important question and the issue to be focused upon is whether the defendant sought to obtain something of value, be it sex or money or loss of simple human dignity, by playing upon the victim's fear and hope of eventual release in order to gain compliance with his demands.

Id., 548 So.2d at 925.
Here, one of the apparent triggers for the defendant's abduction of Zimmerman was her refusal to have sex with him and his desire that she resume being his girlfriend. A reasonable jury could have found from the evidence presented that the defendant abducted Zimmerman at gunpoint and knife point in order to force her to comply with his sexual demands, whether or not he intended to murder her later. In addition, the defendant removed the tape he placed on Zimmerman's mouth during the abduction in order to give her "20 minutes to talk to him." A reasonable juror could find from the circumstances that the defendant was holding out the hope of eventual release to Zimmerman if she would comply with his demands, either in her acquiescence to sex or to a resumption of their relationship. Thus, a reasonable jury could have found beyond a reasonable doubt that the defendant was engaged in the perpetration or attempted perpetration of an aggravated kidnapping at the time that the defendant crossed paths with the Salones. Thereafter, during the course of Zimmerman's escape from the defendant, the defendant shot and killed Troy Salone and shot and injured Evelyn Salone, whom he believed were shielding Zimmerman from him. La. R.S. 14:30(A)(1).
In addition, a reasonable jury could have found beyond a reasonable doubt that the defendant committed a specific intent murder while engaged in second degree kidnapping. Second degree kidnapping is defined in pertinent part as the forcible seizing and carrying of any person from one place to another when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon. La. R.S. 14:44.1(A)(5), (B)(1). From the evidence presented, a reasonable jury could find that the defendant forcibly seized Zimmerman and carried her from one place to another while armed with both a handgun and a knife. Zimmerman testified that the defendant taunted her with the handgun; thus, the jury was left in no doubt as to whether Zimmerman knew that the defendant was armed. La. R.S. 14:30(A)(1).
The state also presented evidence to convince a reasonable jury beyond a *174 reasonable doubt that the defendant specifically intended to kill or inflict great bodily injury while engaged in an aggravated burglary. La. R.S. 14:30(A)(1). Aggravated burglary is defined in pertinent part as "the unauthorized entering of any inhabited dwelling ... where a person is present, with the intent to commit a felony..., if the offender, (1) is armed with a dangerous weapon; or (3) commits a battery upon any person while in such place, or in entering or leaving such place." The defendant asserts that, if the defendant's intent upon entering the Salone residence was to kill or injury Troy Salone, then he could not be guilty of both aggravated burglary and first degree murder when the underlying felony for the burglary was the murder. We find the defendant's arguments unavailing. Evelyn Salone testified that the defendant, while armed with a gun, entered her home after yelling at her, seeking to find someone. Based on the testimony of Zimmerman, the jurors knew that the person the defendant was seeking was Zimmerman, whom the defendant had abducted earlier. Thus, a reasonable juror could find that the defendant entered the trailer, while armed with a handgun, either intending to kill or injure Zimmerman, whom the defendant believed may have been hiding there, or to resume his abduction of her. Consequently, a reasonable juror could also have found the state proved beyond a reasonable doubt that the defendant committed a specific intent murder while engaged in the perpetration or attempted perpetration of aggravated burglary. La. R.S. 14:30(A)(1).
The jury unanimously that found each of these elements proving first degree murder also supported their finding of aggravating circumstances in the penalty phase. The defendant claims that the jury erred in finding the existence of certain aggravating factors, which in turn undermines the jury's death verdict. First, the defendant asserts that even if the evidence is sufficient to support the jury's conviction of first degree murder, the death sentence is disproportionate considering the mitigatory evidence of the defendant's mental state.
La.C.Cr.P. art. 905.3 provides that "[a] sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, determines that the sentence of death should be imposed." La.C.Cr.P. art. 905.7 requires that the jury specify the aggravating circumstance or circumstances found unanimously to exist. In this case, the jury unanimously found that death was an appropriate punishment after finding the existence of three aggravating circumstances: (1) that the defendant was engaged in the perpetration or attempted perpetration of aggravated kidnapping or second degree kidnapping; (2) that the defendant was engaged in the perpetration or attempted perpetration of aggravated burglary; and (3) that the defendant knowingly created a risk of death or great bodily harm to more than one person. See La.C.Cr.P. art. 905.4(A)(1) and (4).[171] In determining that death was an appropriate penalty, the jurors unanimously rejected the defendant's argument that the mitigatory evidence introduced demanded a life *175 sentence. Insofar as the defendant claims his sentence is disproportionate to other sentences imposed in the Sixteenth Judicial District, that argument is addressed in the Capital Sentence Review, infra.
Next, the defendant asserts that the use of the disjunctive word "or" on the penalty phase verdict form in the jury's finding that the defendant was engaged in the perpetration or attempted perpetration of aggravated kidnapping "or" second degree kidnapping,[172] renders that finding "insolubly ambiguous" and invalidates that aggravating circumstance. We do not agree with counsel's argument. As stated above, the evidence was constitutionally sufficient for a reasonable juror to find that the defendant committed a specific intent murder while engaged in the perpetration or attempted perpetration of either aggravated kidnapping or second degree kidnapping. Since second degree kidnapping is a responsive verdict to aggravated kidnapping,[173] and since the facts support the finding of either underlying crime, we find no error in the jury's use of the disjunctive word "or" or injection of an arbitrary factor in the jury's sentencing determination.[174]
After our review of the record and the arguments of counsel, we find no reversible error in any of the other assignments of error raised by the defendant and discussed in the unpublished appendix to this opinion.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La. Sup.Ct. Rule 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has submitted a Uniform Capital Sentence Report (UCSR) and Capital Sentence Investigation Report (CSI) as required by La. Sup.Ct. Rule 28, § 3(b). These documents reveal that the defendant, Donald Lee Leger, Jr., was 32 years of age at the time of the offense. He was born in Morgan City, Louisiana to the union of Donald Leger, Sr. and Barbara Guidry Leger, the second of four children. Both of his parents are still living.
The defendant completed the tenth grade but obtained his G.E.D. several years later. The defendant stated at booking that he had completed approximately two years of higher education. The defendant has never been married and has no children. He has no physical or mental health problems. Sanity was not raised as an issue in this case. However, Mark Leger, the defendant's brother, testified to a family history of alcoholism and abuse, including that the defendant was forced to leave home at the age of 16 and never had a mentor to show him a better way. The defendant's parents did not attend the trial.
*176 The defendant has held several different jobs throughout his life, but has never been able to keep steady employment. He has worked as a welder's helper, electrician's helper, pipefitter and plumber's helper.
According to the UCSR, the defendant has no juvenile criminal record. As an adult, the defendant's rap sheet reflects 11 arrests, six of which resulted in conviction on the following dates:(1) for simple burglary on October 30, 1986, for which he received three years supervised probation; (2) for forgery on January 28, 1988;[175] for which the defendant received 3 years imprisonment, suspended, and 3 years unsupervised probation (3) for disturbing the peace by fighting on April 24, 1991; (4) for simple battery on October 31, 1991; (5) for theft over $500 on November 14, 1994, for which the defendant was sentenced to six years imprisonment; and (6) for attempted simple battery[176] on November 14, 1994,[177] for which the defendant also received a sentence of six years imprisonment.

Passion, Prejudice or other Arbitrary Factors
The defendant is a Caucasian male, who was 32 years old at the time of his offense. The murder victim, Troy Salone, was a 35 year old African-American man. His wife, Evelyn Salone, also shot by the defendant, is also African-American. Despite the racial differences, race was not raised as a factor in this trial. There is no evidence of pretrial publicity that could have tainted the jury pool, and no change of venue was requested. No impermissible racial challenges during jury selection are raised in this appeal. The defendant raised several factors which he claimed injected arbitrary factors into his trial; however, each of these allegations have been addressed in previous assignments of error and have been found to be without merit. No passion, prejudice or arbitrary factors are apparent in this appeal.

Aggravating Circumstances
The jury unanimously found that the murder was committed during the perpetration or attempted perpetration of an aggravated kidnapping and aggravated burglary, and that the defendant knowingly created a risk of death or great bodily harm to more than one person. As previously discussed, there was constitutionally sufficient evidence to support each of the aggravating circumstances found.

Proportionality Review
Although the federal constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991). This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. State v. Sonnier, 380 So.2d 1, 7 (La.1979).
The state's Sentence Review Memorandum reveals that since 1976, there have been 57 indictments for first degree murder other than the instant case in the *177 Sixteenth Judicial District, consisting of Iberia, St. Martin and St. Mary parishes. Of those 57 cases, 24 of the defendants were allowed to plead to first degree murder and a life sentence, or to a lesser charge, often at the request of the victim's family. Eight of the defendants' cases are pending trial. In 18 of the cases, the jury returned either a guilty verdict of first degree murder but sentenced the defendant to life imprisonment, or a guilty verdict of second degree murder, with its automatic life sentence. In one case, the defendant was found not guilty by a jury; for one case, no disposition is listed. In five of the cases, the jury found the defendant guilty of first degree murder and imposed a sentence of death. We will review those cases to determine whether the death sentence imposed in this case is disproportionate to other death sentences imposed in the Sixteenth Judicial District.
In State v. Elmo Patrick Sonnier, 379 So.2d 1336 (La.1979), appeal after remand, 402 So.2d 650 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983), this court on original hearing upheld the imposition of the death penalty for Sonnier's two convictions for first degree murder. In that case, the defendant and his brother posed as police officers and abducted two young people from their parked car, raping the female victim and shooting the victims three times in the back of the head. On rehearing, this court remanded for a new sentencing hearing, finding a procedural error during the penalty phase. After a second penalty hearing, Sonnier was again sentenced to death on both counts. This court affirmed the sentence; Sonnier has been executed.
In State v. Welcome, 458 So.2d 1235 (La.1983), cert. denied, 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 152 (1985), the jury found the defendant guilty of two counts of first degree murder, sentencing him to life imprisonment on one count and imposing the death penalty on the other count. This court upheld the imposition of the death penalty, finding that the defendant shot and killed two people with whom he had quarreled.
In State v. Bourque, 622 So.2d 198 (La. 1993), appeal after remand, XXXX-XXXX (La.7/1/97), 699 So.2d 1, cert. denied, 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998), the court affirmed the defendant's conviction for shooting and killing his former girlfriend and her brother, but remanded for a new sentencing hearing, finding that the evidence of the defendant's commission of another, apparently unrelated, murder had injected an arbitrary factor into the sentencing proceedings. Following a second penalty phase proceeding, Bourque again received a death sentence, which was affirmed by this court.
In State v. Connolly, XXXX-XXXX (La.7/1/97), 700 So.2d 810, this court upheld the imposition of the death penalty for the first degree murder of a nine year old child during the commission of an aggravated rape. Defendant, a Sunday school teacher, sodomized the victim at a church picnic before stabbing him to death.
In State v. Letulier, XXXX-XXXX (La.7/8/98), 750 So.2d 784, the defendant repeatedly stabbed the elderly victim and stole his wallet, then stuffed the body into the victim's pick-up truck and drove it into a bayou. The defendant was allowed to plead guilty to the first degree murder charge and, following a penalty hearing, the jury unanimously sentenced the defendant to death. This court affirmed the death sentence.
Given the facts and circumstances of this case, and comparing this case to the cases tried in the Sixteenth Judicial District, particularly the Sonnier, Welcome, and *178 Bourque cases, we find that the imposition of the death penalty in this case is not disproportionate to other cases in the Sixteenth Judicial District where death has been imposed. Moreover, the cases in Louisiana are legion in which juries have sentenced to death defendants whose murders have been found to have multiple aggravating factors, as is found here.

DECREE
For the reasons assigned herein, and within the unpublished appendix made part of this opinion, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
CALOGERO, C.J., concurs in part, dissents in part and assigns reasons.
CALOGERO, Chief Justice, concurring in part, dissenting in part, and assigning reasons.
I concur in the majority's decision to affirm the conviction; however, I respectfully dissent from that part of the opinion which affirms the sentence of death.
I agree with the majority and the state that the inculpatory statement taken from the defendant on December 11, 2001, the "First Statement," was obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the Fifth Amendment, and that the trial court should have suppressed the statement. This first interrogation lasted over two hours, and only the last 28 minutes were videotaped. As the majority notes, throughout the taped portion of the interrogation, "it is possible to hear the defendant repeatedly stating that he did not want to talk." Ante, p. 126. The police, instead of "scrupulously honoring" that invocation of his privilege against self-incrimination, see Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313(1975), substituted interrogation teams and persisted in interrogating the defendant over his assertions that "he did not want to talk about it" and "did not want to talk anymore," finally stating, "I want to go back to my cell ... I'm through answering questions. Can I leave?" The police finally terminated the interview at this point.
In light of this behavior of the police officers during this initial interrogation, I must disagree with the majority's facile conclusions that the involuntary taking of this initial statement did not taint the voluntariness or constitutionality of the subsequent inculpatory statements. The succeeding interrogations resulting in the "Third" and "Fourth" statements are the most problematic in my view.
The so-called "Third Statement," videotaped but not recorded, occurred in the *179 defendant's cell. Although the jury viewed the time-lapse video, the content of this inculpatory statement was presented to the jury through the testimony of Chief McGuire. This confession was the product of a conversation initiated by the police, even though the officers knew that the defendant had just 18 hours earlier repeatedly invoked his right to remain silent  invocations the majority concedes were not "scrupulously honored" by the police officers. These police officers persisted in not honoring the defendant's invocation of his rights when Captain Broussard initiated his "casual" conversation with the defendant while the defendant was in his cell, Ante, p. 129, ultimately asking the defendant if he would make a statement. When he secured the answer he wanted, Captain Broussard quickly summoned Chief McGuire, and the two officers then began the unrecorded, two-hour interrogation of the defendant. Invidiously, neither officer advised the defendant of his rights before initiating this interrogation, despite the fact that the defendant had clearly, as the majority concedes, asserted his right to remain silent just 18 hours earlier.
Likewise, I find the so-called "Fourth Statement" also constitutionally compromised by the failure of the officers to honor the defendant's invocations of his right to remain silent and because it is inextricably linked to the "Third Statement," immediately following which Chief McGuire had asked the defendant to make a recorded statement. The interrogation resulting in this "Fourth Statement" was commenced less than one hour from the conclusion of the unrecorded "Third Statement." Notably, the defendant began this third interrogation telling the officer, in vain it turns out, that he did not want to talk anymore. Ante, p. 131. Instead of "scrupulously honoring" this clear invocation of his right to remain silent, the officers persisted even when the defendant expressed his discomfort with giving a statement, and even reminding the defendant of the conversation the night before, i.e., the interrogation wherein the officers first refused to honor the defendant's invocations of his right to remain silent and which resulted in the involuntary "First Statement." Eventually, the officers secured the defendant's agreement to give a written consent to search, but when the defendant insisted a second time that he did not want to talk, Ante, p. 132, the officers nonetheless persisted in their efforts to secure the consent to search, along with additional inculpatory statements. Given this chain of events, during which the police have not once honored any of the defendant's invocations of his right to remain silent, the majority nonetheless concludes that the defendant understood "he could remain silent, could cut off questioning at any time, could request an attorney during questioning, or could waive his right to remain silent and speak with the officers. The defendant chose to continue to speak with the officers." Ante, p. 133. There is, of course, no basis in the record for such a conclusion, because the police never did honor any of the defendant's invocations of his right to remain silent, so one must rhetorically ask how would he have known that he could have stopped the questioning at any time.
Notwithstanding the fact that these statements should have been suppressed by the trial court, I do agree with the majority that the admission of these statements in the guilt phase of the defendant's trial amounted to harmless error beyond a reasonable doubt under the particular facts of this case. I do not make that statement lightly; however, the direct evidence, including eyewitness testimony and physical evidence, introduced by the state proving each element of the crime in this case is such that these inculpatory statements were cumulative and, under the *180 facts of this case, it can be reasonably said that the jury's verdict of guilt was surely unattributable to the admission of these statements under the Sullivan standard.
Although I thus concur in the majority's decision affirming the conviction for first degree murder, I must dissent from the majority opinion affirming the sentence of death. These statements, in my view, did interject an arbitrary factor into the penalty phase of the trial, wherein the elements of the charged offense are no longer paramount and the defendant's character and propensities become the focus of the proceeding. In State v. Lee, 524 So.2d 1176 (La.1987)(on rehearing), we held that the erroneous admission of an unlawfully obtained confession was harmless error with respect to the guilt phase, but we then held that the erroneous admission of this confession was not harmless error with respect to the penalty phase.[1] 524 So.2d at 1190-92. In Lee, the defendant's confession was procured in violation of his Sixth Amendment right to counsel, and should not have been admitted in evidence. While the properly admitted evidence was such that we concluded that the confession surely did not contribute to the jury's verdict of guilt, we found that the same could not be said of the jury's decision to impose the death sentence. We reasoned as follows:
There is surely a reasonable possibility that this evidence might have contributed to the jury's decision [to impose the death penalty]. Listening to the confession, particularly those portions in which the defendant describes his conduct with apparent indifference, certainly could have led one or more members of the jury to conclude that he felt no remorse for his deeds. A juror listening to the confession also could reasonably be expected to experience strong emotions, ranging from mortification to outrage. Such impressions or emotions could in turn have contributed to the decision of one or more jurors to impose the death penalty.
Another consideration is that even though the evidence of defendant's guilt was overpowering, that evidence was nonetheless circumstantial. Even if the jury was certain enough of the defendant's guilt to convict (without hearing the confession), one or more jurors might have retained minor trepidations about the nature of the state's circumstantial evidence, or felt a general ambivalence about imposing the death penalty. Such uncertainty, though not rising to the level of reasonable doubt regarding guilt, might have led such a juror to hold out for a life sentence. However, any such juror reservations might well have been swept away by the introduction of the confession.
We therefore cannot declare a belief that the introduction of the confession was harmless beyond a reasonable doubt with respect to the jury's decision to impose the death penalty. We also cannot say that there is no reasonable possibility that the confession might have contributed to at least one juror's decision to impose the death penalty.
524 So.2d at 1192-93 (emphasis in original)(footnote omitted).
Our reasoning in Lee is strongly applicable to the case before us today. In distinguishing Lee, the majority in the instant *181 case claims that the defendant's sad demeanor depicted on these tapes more likely tended toward the establishment of the mitigating circumstances of remorse or regret, because the videotaped confessions did not depict him as a conscienceless and remorseless killer. Ante, p. 141. However, this rationale rests on pure speculation, in my view. The defendant's rather pathetic and wretched conduct during these statements, depicted on lengthy videotapes for the jurors to witness, could have just as easily, if not more likely, disgusted and repulsed these death-qualified jurors and have led them to agree with the defendant's own assertion that his life was not worth continuing.
Furthermore, while the otherwise overwhelming evidence of guilt in Lee was somewhat circumstantial, a quality not present in the instant case, the defense did strenuously urge to the jurors that the crime was committed "in the heat of blood" or as the result of "sudden passion," and thus deserving of a manslaughter verdict rather than guilty of first degree murder. While I agree with the majority that the defendant failed to establish those mitigating factors by a preponderance of the evidence, the majority's rationale relies in part on the defendant's own videotaped confessions to justify the jury's apparent rejection of his "heat of blood" or "sudden passion" defense. Ante, p. 171. Accordingly, if there were any jurors who, although certain enough that the crime was not committed "in the heat of blood" or "sudden passion" to vote for conviction of first degree murder, harbored minor uncertainties or trepidations as to the evidence on this issue, it is certainly possible that such jurors, had they not been exposed to the videotaped confessions, would have held out for the imposition of a life sentence rather than the death penalty. Only one juror would have had to have been swayed in order to prevent the imposition of the death penalty.
In my view, the introduction of these unconstitutionally obtained confessions served to obviate any conceivable possibility that the jury might have returned a life sentence, because their introduction would dispel even an unreasonable doubt in the mind of a juror who might have been leaning towards the imposition of a sentence of life rather than death. The penalty phase in a capital trial is simply too fraught with tinder-box emotion to conclude that the improper introduction of videotaped confessions, depicting the defendant as a deplorable human being and procured in violation of the defendant's constitutional rights, can be deemed harmless error beyond a reasonable doubt. Because I cannot conclude beyond a reasonable doubt that the erroneous admission of these videotaped confessions surely did not contribute to the jury's decision to impose the death penalty, I would vacate the sentence of death and remand the case to the district court for a new sentencing hearing before a jury which has not been exposed to the improperly obtained confessions.
NOTES
[1] The indictment also charged defendant with four additional counts, including the attempted first degree murder of Katherine Kimberly Zimmerman (count two); the attempted first degree murder of Evelyn Boykin Salone (count three); possession of a firearm by a convicted felon (count four); and carjacking (count five). Vol. 1, p. 67. Citations to the record in this opinion will be designated by the volume and page number.
[2] La. Const. art. 5, § 5(D) provides in pertinent part: "... a case shall be appealable to the supreme court if ... (2) the defendant has been convicted of a capital offense and a penalty of death actually has been imposed."
[3] Vol. 11, p. 2650.
[4] Vol. 11, p. 2625.
[5] Id.
[6] Vol. 11, p. 2626.
[7] Vol. 11, p. 2626.
[8] Vol. 11, p. 2627.
[9] Vol. 11, p. 2630.
[10] Vol. 11, p. 2668.
[11] Vol. 11, p. 2669.
[12] Vol. 11, p. 2670.
[13] Vol. 11, p. 2671.
[14] Vol. 11, p. 2671.
[15] Evelyn and Troy Salone had one child together, Mary, who was seven years old at the time of the shooting. On the night of December 10, 2001, Mary was spending the night with her grandmother, Troy's mother, who lived next door. Troy had older children from a previous relationship, however, only Zeb and Mary lived with the Salones.
[16] Vol. 11, p. 2692.
[17] Vol. 11, p. 2696.
[18] Vol 11, p. 2674.
[19] Vol. 11, p. 2674.
[20] Vol. 11, p. 2675.
[21] The defense stipulated to the admission of the autopsy report at trial. See Vol. 5, p. 1211.
[22] The 911 recordings from that evening, which included Zimmerman's and Zeb's call, and included the calls of neighbors, were introduced in evidence at trial and played for the jury.
[23] Defendant's assignments of error that are not treated in the main body of this opinion will be reviewed in an unpublished appendix which will comprise part of the record in this case.
[24] These statements were videotaped or audiotaped. None of the statements were formally transcribed by a certified court reporter. At trial, the state relied solely on the video and audio tapes of these statements, which were played for the jury.
[25] See Vol. 4, p. 953-960 for a recitation of all of the state's Art. 768 notices.
[26] Vol. 4, p. 961-966.
[27] Vol. 1, p. 65.
[28] See Vol. 4, p. 754, 768; Vol. 12, p. 2792-2793, 2819-2821.
[29] Vol. 12, p. 2820; see also Vol. 4, p. 768.
[30] Vol. 4, p. 785; Vol. 12, p. 2978.
[31] Vol. 4, p. 795. Although testified to at the suppression hearing, this statement was not introduced at trial.
[32] Vol. 3, p. 605.
[33] Vol. 11, p. 2730-2731. Although trial defense counsel intimated that the defendant's injury may have been inflicted by the police, the EMT testified that even the defendant confirmed to him that the defendant rammed his head into the wall at the police station on his own. Vol. 11, p. 2731.
[34] Vol. 4, p. 805. The defendant was originally transported to the St. Mary Parish jail, but the administrative decision was made to move him to the jail at the Franklin Police Department because the father of the victim, Troy Salone, was an employee of the law enforcement center. Vol. 4, p. 787.
[35] Vol. 4, p. 806.
[36] The fifth statement, a recorded telephone conversation between the defendant and his brother, Mark Leger, does not implicate the defendant's right to remain silent. However, the defendant claims the fifth statement was obtained in violation of his invocation of counsel. Consequently, the admissibility of that statement will be discussed in a subsequent section.
[37] "The warnings must inform the person in custody `that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' 384 U.S., at 444, 86 S.Ct., at 1612." This footnote is in the original quotation.
[38] Vol. 4, p. 824.
[39] Vol. 4, p. 807. Lt. Guillory's trial testimony differed from his suppression hearing testimony. At trial, Lt. Guillory admitted on cross-examination that he did not hear Agent Rupert read the defendant his rights. "He [Rupert] told me he did and I just took it for granted that it was done." Vol. 13, p. 3076-3077.
[40] Appellee's Brief, p. 28, 29.
[41] The rights form discussed with the defendant at this time reflects the time as 8:30 p.m. Vol. 1, p. 104.
[42] Although the defendant stated in his first videotaped statement that the cut on his face was sustained during his arrest when the officers handcuffed him, in another statement he said that he sustained the cut when he was running through the woods by the Salone residence. In the second videotaped statement, it appears that the defendant's ear has been bandaged.
[43] Vol. 13, p. 3069-3070.
[44] The rights portion of the form states: "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer." Vol. 1, p. 104.
[45] Vol. 1, p. 104.
[46] Vol. 1, p. 104.
[47] The defendant was still on suicide watch at this time. Vol. 4, p. 843-844.
[48] Vol. 4, p. 843-844, 848. On the time-lapse videotaped recording, Chief McGuire appears at approximately 8:26 a.m.
[49] Vol. 4, p. 835. Chief McGuire's trial testimony regarding her encounter with the defendant was consistent: "I had just arrived at the Police Station and Captain Broussard advised me that Mr. Leger had gotten dressed and he was talkative. So at that point I proceeded to the holding cell area and asked Mr. Leger if he had gotten some rest, if he would like a cup of coffee. He said that he did. I went and retrieved a cup of coffee, went into the cell area and sat on the bunk; crossed my legs like kids would do, and Mr. Leger did the same, and we faced each other and we spoke." Vol. 13, p. 3004. The videotape of this encounter reflects this sequence of events.
[50] Vol. 13, p. 3005-3008.
[51] Vol. 13, p. 3008.
[52] Vol. 12, p. 3026-3027.
[53] Vol 4, p. 840.
[54] Vol. 4, p. 840.
[55] Vol. 4, p. 844-845.
[56] Vol. 4, p. 809, 810.
[57] Vol. 1, p. 105. Unlike the first waiver form, this waiver form indicated that the defendant was being questioned about "kidnapping" and "shooting."
[58] Seibert, 542 U.S. at 617, 124 S.Ct. at 2613.
[59] Seibert, 542 U.S. at 612, 124 S.Ct. at 2610.
[60] Seibert, 542 U.S. at 613, 124 S.Ct. at 2611.
[61] See Vol. 1, p. 104.
[62] Vol. 13, p. 3103.
[63] Vol. 4, p. 818.
[64] Vol. 4, p. 846.
[65] Vol. 13, p. 3074.
[66] Vol. 13, p. 3087.
[67] Vol. 13, p. 3103.
[68] Vol. 13, p. 3089.
[69] Vol. 13, p. 3089.
[70] Mauro, 481 U.S. at 527, 107 S.Ct. at 1935.
[71] Id.
[72] Mauro, 481 U.S. at 528, 107 S.Ct. at 1936. Indeed, the Court specifically mentioned safety concerns the police would have regarding a suspect in custody.
[73] Id.
[74] La. R.S. 15:451 provides that "[b]efore what purposes to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."
[75] Vol. 1, p. 125-128, 135-137. By cover letter dated December 9, 2002, the defendant corrected errors in the original October 8, 2002 motion. Vol. 1, p. 157-162.
[76] Vol. 1, p. 129-132.
[77] Vol. 1, p. 162.
[78] Vol. 4, p. 802.
[79] Vol. 4, p. 802-803.
[80] Vol. 1, p. 209-216 "Motion to Recuse the District Attorney;" Vol. 1, p. 217-218, "Motion For Transcript on Hearing of April 12, 2002;" Vol. 2, p. 399-406, "Motion and Order to Recuse the 16th District Court Judge Charles Porter;" Vol. 4, p. 937-939. The record affirmatively shows that the defendant received copies of the transcript he sought, he just did not agree with what was presented. Vol. 4, p. 925-926.
[81] Vol. 4, p. 935-939.
[82] Vol. 1, p. 205-206.
[83] The defendant had requested whether either attorney had ever been the subject of attorney discipline.
[84] Vol. 4, p. 936-937.
[85] Vol. 4, p. 937.
[86] Vol. 4, p. 944.
[87] Vol. 4, p. 945.
[88] Vol. 2, p. 290-297.
[89] Vol. 4, p. 953-965.
[90] Vol. 5, p. 1042-1044.
[91] Vol. 2, p. 306-310.
[92] Vol. 2. p 382.
[93] Vol. 5, p. 1057.
[94] Vol. 5, p. 1057.
[95] Vol. 5, p. 1086-1089.
[96] Vol. 5, p. 1072-77, 1083-1084.
[97] Vol. 5, p. 1091.
[98] Earlier, at the April 1, 2003 hearing, the prosecutor suggested, on the basis of the volume of the defendant's pro se motions, that the court hold a hearing pursuant to Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) to determine whether the defendant would prefer to represent himself. The trial court responded:

Well, I would think that and I would encourage the defendant to consult with Counsel to file motions or permit his Counsel to file motions on his behalf. At some point in the orderly process of this trial, I will not permit him to act singularly in light of the fact that he is represented by Counsel. I am permitting this at the moment, pre-trial, but I will not permit it once we move into a heavier preparation schedule moving toward the trial. So I will encourage the defendant on those motions that he needs to file, that he needs to file it through Counsel, unless it is a motion that is directed towards relief of his Counsel.
Vol. 4, p. 944.
[99] Vol. 5, p. 1086-1091.
[100] Vol. 4, p. 926, 927-936; Vol. 5, p. 1055-1058.
[101] Vol. 4, p. 926-927; Vol. 5, p. 1076.
[102] See Sealed Transcripts, "Motion in Camera," January 6, 2004.
[103] Vol. 13, p. 3121.
[104] Kimberly Zimmerman also made a positive identification of the defendant, but her identification of him is not contested by appellate defense counsel.
[105] Vol. 12, p. 2901-2904.
[106] Vol. 12, p. 2970-2975.
[107] Vol. 4, p. 776; Vol. 11, p. 2676-2677.
[108] Vol. 3, p. 629; Vol. 4, p. 775-777; Vol. 11, p. 2676-2681, 2683.
[109] Vol. 3, p. 629; Vol. 4, p. 779-780, 781-783.
[110] Vol. 11, p. 2693.
[111] Vol. 11, p. 2694.
[112] Vol. 11, p. 2697, 2701-2702.
[113] Vol. 11, p. 2677, 2702.
[114] Vol. 11, p. 2688, 2706; Vol. 12, p. 2905-2906
[115] Vol. 4, p. 966-967.
[116] Vol. 1, p. 99-100.
[117] Vol. 1, p. 101-102.
[118] Vol. 1, p. 101.
[119] Vol. 1, p. 101.
[120] Vol. 1, p. 102A.
[121] Vol. 1, p. 102B.
[122] Vol. 4, p. 966.
[123] Vol. 3, p. 746-747; Vol. 11, p. 2626.
[124] Vol. 12, p. 2924-2925.
[125] See ex. Vol. 7, p. 1608.
[126] Vol. 7, p. 1659, 1662.
[127] Vol. 7, p. 1694.
[128] Previous to this colloquy, the prosecutor informed the jury panel of the bifurcated procedure in a capital trial.
[129] Vol. 7, p. 1694-1695.
[130] Vol. 7, p. 1712-1713 (emphasis in original).
[131] Vol. 7, p. 1725 (emphasis in original).
[132] Id.
[133] The record affirmatively shows that the prospective jurors were instructed about the presumption of innocence in the general voir dire following pre-qualification. See Vol. 10, p. 2396-2397. There is no indication that Mr. Domangue signaled any problem in applying that presumption to the defendant. Id.
[134] Vol. 10, p. 2449.
[135] Vol. 10, p. 2490.
[136] Vol. 8, p. 1855.
[137] Vol. 8, p. 1861-1862.
[138] Prior to her individual questioning, the prosecutor instructed the panel about the bifurcated process of a capital trial, the focus of the sentencing hearing as set forth by statute, the state's burden of proof at penalty phase, the types of evidence that could be admitted in the penalty phase, and as to aggravating and mitigating circumstances. Vol. 8, p. 1881-1889.
[139] Within the prior panel discussion, the prosecutor discussed the possible sentences for first degree murder and made the following two statements: "You have to make a determination as to what is appropriate given the facts and circumstances of each particular case-whether a death sentence is appropriate or a life sentence is appropriate. Does everybody understand that it's not automatic one way or the other?" and "Does everyone understand that it's not automatic? It's never an automatic life sentence or an automatic death sentence. In every case the sentence is determined based upon whether it's appropriate given the facts of that case. Everybody understand that?" Vol. 8, p. 1885, 1888. It is clear in the context of the record that the prosecutor was referencing his prior panel discussion with this question.
[140] Vol. 8, p. 1892-1893.
[141] Vol. 8, p. 1908.
[142] Vol. 8, p. 1914.
[143] Vol. 8, p. 1918.
[144] Vol. 8, p. 1918.
[145] The ninth panel was pre-qualified on January 14, 2004, a Wednesday. Thus, Ms. Raymond would have known whether her custody hearing would conflict with her possible jury service prior to the completion of voir dire.
[146] Vol. 8, p. 1893 (emphasis in original).
[147] Vol. 8, p. 1908.
[148] Id.
[149] Vol. 8, p. 1915.
[150] Vol. 8, p. 1919.
[151] Id.
[152] Vol. 7, p. 1727.
[153] Vol. 8, p. 1755-1756.
[154] Vol. 8, p. 1772.
[155] Vol. 8, p. 1777.
[156] Vol. 8, p. 1781.
[157] Id.
[158] Id.
[159] Vol. 7, p. 1607.
[160] Vol. 7, p. 1626.
[161] Vol. 7, p. 1628-1629.
[162] Vol. 7, p. 1639-1641.
[163] Vol. 7, p. 1648-1649.
[164] Vol. 7, p. 1650.
[165] Vol. 7, p. 1651.
[166] In a footnote, appellate defense counsel also contends the trial court's granting of the state's cause challenge to prospective juror Courtney Ina was an abuse of the trial court's discretion. The record shows the trial court found that "she did not appear ... to be sufficiently mature in her opinions and she seemed to follow the suggestion of whatever questioner appeared and her opinion was not fixed one way or another." Vol. 9, p. 2133. The record supports this characterization of Ms. Ina's voir dire responses. See Vol. 9, p.2090-2093, 2116-2117, 2132-2133. There was no abuse in the trial court's granting of a state cause challenge to this prospective juror.
[167] La. R.S. 14:30(A) provides in pertinent part:

A. First degree murder is the killing of a human being:
(1) When the offender has the specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, drive-by shooting, first degree robbery, simple robbery, or terrorism. * * *
(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.
[168] La. R.S. 14:31(A)(1) provides:

A. Manslaughter is: (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; . . . blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; ...
[169] The fact that we have found that the defendant's statements of December 11, 2001 to Lt. Guillory, Agent Rupert, Chief McGuire and Captain Broussard should not have been admitted in evidence does not materially affect our determination of this assignment of error. The defendant reiterated the statements concerning his mental state in subsequent statements which this court has found to be admissible.
[170] Vol. 11, p. 2650.
[171] La.C.Cr.P. art. 905.4(A)(1) and (4) provide, in pertinent part:

A. The following shall be considered aggravating circumstances:
(1) The offender was engaged in the perpetration or attempted perpetration of ... aggravated kidnapping, second degree kidnapping, aggravated burglary....
* * *
(4) The offender knowingly created a risk of death or great bodily harm to more than one person.
[172] Vol. 3, p. 676.
[173] See La.C.Cr.P. art. 814(A)(18).
[174] Even if the defendant's argument were persuasive, this circumstance would still not invalidate the defendant's death sentence. This court has held repeatedly that the invalidation of one aggravating circumstance, when there are other aggravating circumstances supported by the record, does not invalidate a death sentence. State v. Manning, XXXX-XXXX p. 71, 885 So.2d at 1106.
[175] The defendant's rap sheet, attached to the CSI, shows a disposition date of February 4, 1988.
[176] The defendant's rap sheet, attached to the CSI, bears a hand-written notation that this charge should be attempted simple burglary.
[177] See Vol. 13, p. 3208-3209.
[1] The majority cites Lee and thus recognizes that an erroneously admitted confession may be harmless as to the guilt phase of a capital trial, yet that finding does not automatically translate into a finding of harmless error in the penalty phase of a capital trial, which has a vastly different focus; instead, the reviewing court must conduct an independent examination with regard to the penalty phase. Lee, 524 So.2d at 1191; see Ante, pp. 140-41 and 141 (separately analyzing the erroneous admission of the "First Statement" with regard to the guilt and penalty phases).